LAKE MICHIGAN CONTRACTORS,
INC., Plaintiff,

v.

The MANITOWOC COMPANY,
INC. and Bay Shipbuilding
Company, Defendants.

No. 1:00–CV–787.

United States District Court,
W.D. Michigan,
Southern Division.

May 29, 2002.

Kevin B. Even, Culver, Knowlton, Even & Franks, Muskegon, MI, Michael J. Gardner, Williams, Mullen, Clark & Dobbins, P.C., Virginia Beach, VA, Christopher A. Abel, Williams, Mullen, Newport News, VA, for Plaintiff.

William D. Howard, Strain, Murphy & VanderWal, Matthew J. Malleis, Irwin & Malleis, PC, Grand Rapids, MI, David W. Neeb, Davis & Kuelthau, SC, Milwaukee, WI, for Defendant.

Jon G. March, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI, for Mediator.

## OPINION

QUIST, District Judge.

Plaintiff, Lake Michigan Contractors, Inc. ("LMC"), has sued Defendants, The Manitowoc Company, Inc. and Bay Shipbuilding Company ("BSC"), alleging that Defendants breached an agreement to construct a dredge (the "Dredge") by failing to adhere to the schedule, failing to perform the work in an enclosed facility, and failing to perform the work in a timely, cost effective manner. Defendants have filed a motion in limine to exclude the expert testimony of LMC's expert, Leonard Willis, P.E., who has issued two reports, both of which conclude that BSC overcharged LMC by significant amounts for its work on the Dredge. On May 7, 2002, the Court received testimony from Willis and heard oral arguments regarding Defendants' motion. The Court now issues its Opinion and, for the reasons below, concludes that the motion should be granted.

### I. *Background*

During the fall of 1999, LMC decided to acquire a new dredge in order to expand its dredging business. BSC expressed an interest in doing the work. LMC's original plan was to have BSC convert a barge it owned into a dredge. After further consideration, LMC decided to construct an entirely new dredge. In early November, the parties agreed that BSC would construct the hull of the Dredge for $1.00 per pound and the deckhouse for $1.15 per pound. BSC arrived at its costs based upon a drawing produced by Tim Graul, LMC's naval architect. LMC did not have a set of plans and specifications at that time which would enable BSC to arrive at a fixed price to construct the Dredge. Therefore, work beyond construction of the hull and deckhouse was to be performed on a time and materials ("T & M") basis. BSC began work in December after LMC wired it approximately $1 million.

In January 2000, BSC recommended that LMC consider converting the agreement to a T & M basis due to the large number of changes that were occurring in the design of the Dredge. LMC agreed to convert to a T & M basis and from that point on, all of BSC's work was billed on a T & M basis. In March 2000, BSC decid-

ed to move the Dredge out of BSC's covered fabrication shop, where it was being constructed. LMC objected, and BSC agreed to delay the move to mid-May. LMC contends that BSC agreed to construct the Dredge entirely within its covered fabrication shop and that BSC's decision to move the Dredge from the shop to the graving docks, where it was exposed to the elements, was a breach of their agreement. BSC completed its work on the Dredge in September 2000. By that time, LMC had billed and LMC had paid approximately $7.7 million. After taking possession of the Dredge, LMC filed this lawsuit, claiming that BSC overcharged LMC for the Dredge due to BSC's inefficiencies, failure to adhere to the schedule, and failure complete the work in the enclosed facility.

In support of its claims, LMC has retained Leonard Willis ("Willis"), a licensed professional engineer, to serve as an expert witness. Willis issued a written report dated February 20, 2001 ("Initial Report"), and a supplemental report dated July 6, 2001 ("Supplemental Report"). According to the Initial Report, Willis was retained "to provide factual and expert testimony concerning the damages LMC believes it sustained in connection with construction" of the Dredge. (Initial Report at 2, Defs.' Br. Supp. Ex. A.)

In the Initial Report, Willis stated that he was advised by the parties that "the Dredge was being constructed under an oral, time and materials, contract between LMC and BSC, and LMC was paying BSC's charges on a demand basis." (Id. at 3–4.) Willis concluded that BSC overcharged LMC $1,120,779 for construction of the Dredge. (Id. at 17.) This figure is based on Willis' conclusions that: (1) under the T & M agreement BSC should have been charging LMC a composite hourly rate of $32.73 instead of a rate in excess of $36.00 per hour, which results in an over-

charge of $449,649, (id. at 7–8); (2) BSC improperly charged LMC $5,303 for work BSC performed incorrectly, (id. at 9); (3) the early move-out of the covered fabrication shop resulted in extra and unnecessary charges to LMC, including $12,748 for extra manhours and production materials caused by lost productivity as a result of the move; weather-related losses of $34,504 for the period of May 16, 2000, through June 30, 2000; $23,211 for additional protective measures and clean-up work due to rain; and $44,423 for additional hours spent cleaning up loose materials turned into slurry by rain water that entered the Dredge, (id. at 10–13); and (4) a $555,941 reduction for BSC's inefficiency from April 19 through August 26 based upon Willis' determination that BSC was 30% inefficient during that period, with 10% of that inefficiency being caused by LMC, (id. at 13–16).

Willis' factual predicate for his Supplemental Report is significantly altered from that in the Initial Report. In that report, he opines that there was not a T & M contract. (Supplemental Report at 4, Defs.' Br. Supp. Ex. B.) Instead, he states that BSC agreed to build the hull and deckhouse of the Dredge for a fixed price of $1,266,200 and that there was no T & M agreement in place for the remaining construction. (Id. at 4, 16.) Because BSC ultimately charged LMC $2,145,708 for its work on the hull and deckhouse, Willis concludes that BSC overbilled LMC $879,508 ($2,145,708–$1,266,200). (Id. at 16–17.) Willis also concludes that despite his previous use of the Price Schedule for his calculation of BSC overcharges, there is no basis to conclude that the parties agreed that the Price Schedule would apply to BSC's work. (Id. at 9.) Instead of using the Price Schedule, Willis applies "U.S. Average Shipyard Industry Rates." (Id. at 12.)

Willis' conclusions with respect to adjustments for BSC improper work and early move-out of the Dredge from the covered fabrication shop are essentially the same. His analysis regarding BSC's efficiency is significantly different. After identifying several factors that contributed to BSC's reduced efficiency, Willis opines that BSC was significantly inefficient in all hours spent on the Dredge, citing: (1) BSC's own recognition that it was experiencing unacceptable levels of productivity; (2) BSC's efficiency rate of 68% for the work performed on the hull and deckhouse; and (3) BSC's grossly inefficient labor and supervision application patterns. (*Id.* at 25–32.) Based upon the identified factors, Willis concludes that BSC was no more than 60% efficient for the entire project and that LMC was responsible for no more than 25% of that inefficiency, requiring a 30% reduction for all hours for inefficiency. (*Id.* at 33.) After making all of his deductions, Willis determines that fair market value of labor, material and other charges, and the original fixed-price contract for the hull and deckhouse is $5,444,434. (*Id.* at 43.)

Willis also includes three alternate valuations in his Supplemental Report. The first valuation is based upon an alleged promise by BSC to complete the work known to be required when the Dredge was moved out of the fabrication shop for $4 million. Willis concludes that based upon the alleged agreement, a reasonable price is $4,575,186. (*Id.* at 46–47.) The second valuation is based upon the assumption that LMC would have moved the Dredge to McNally Shipyard in Canada and that LMC would have saved $1,468,775 in construction costs. (*Id.* at 47.) The final valuation of $5,810,960 is based upon the scenario where all work on the Dredge was performed on a T & M basis using Willis' "U.S. Industry Standards" of $31.90 per manhour, a 9% material and subcontract mark-up, and a 70%

efficiency rate, for a total value of $5,810,960. (*Id.* at 48.)

## II. *Discussion*

### A. Standard for Admissibility

■ Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court addressed the admissibility of expert testimony based upon scientific knowledge. The Court explained that in determining whether to admit expert testimony, a trial court must act as a gatekeeper under Rule 104(a) and examine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. at 2796. In performing this function, the trial court must first determine whether the subject of the expert's proposed testimony has a scientific basis, i.e., is it "supported by appropriate validation." *Id.* at 590–91, 113 S.Ct. at 2795. If so, the court must then determine whether the testimony is relevant—does it "fit" the facts in issue? *Id.* at 591–92, 113 S.Ct. at 2795–96. To assist courts in determining whether the expert's reasoning or methodology is sci-

entifically valid or reliable, the Court identified a non-exhaustive list of non-dispositive factors that might provide guidance: (1) whether the theory or methodology has been or can be tested; (2) whether it has been subjected to peer review; (3) whether it has a known or potential rate of error; and (4) whether it has been generally accepted in the scientific community. *Id.* at 593–94, 113 S.Ct. at 2796–97. The Sixth Circuit has also identified an additional factor set out by the Ninth Circuit in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (on remand), 43 F.3d 1311, 1317 (9th Cir.1995): "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir.1997).

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court considered whether the analysis in *Daubert* for determining the admissibility of expert testimony based upon scientific knowledge also applied to determining the admissibility of expert engineering testimony based upon "technical" or other specialized knowledge. The Court held that a trial court's gatekeeping function under Rule 702 applies to *all* expert testimony, regardless of the basis of the expert's knowledge. *Id.* at 147–49, 119 S.Ct. at 1174–75. Thus, regardless of the type of expert testimony at issue, the trial court must still ensure that the expert's proposed testimony is both "reliable and relevant." *Id.* at 149, 119 S.Ct. at 1174. With regard to the specific factors identified in *Daubert*, the Court concluded that a trial court considering expert testimony based on knowledge other than scientific knowledge may consider some or all of those factors in determining whether the proposed expert testimony is reliable. *Id.* at 149–50, 119 S.Ct. at 1175. The

Court stressed, however, that the test of reliability under Rule 702 is a "flexible" one, and application of the *Daubert* factors in a particular case may or may not be appropriate, depending on the nature of the particular testimony. *Id.* at 141, 150–51, 119 S.Ct. at 1171, 1175–76. Thus, in certain cases, all of the *Daubert* factors may be helpful to the court's inquiry, while in other cases where reliability derives solely from the personal knowledge or experience of the witness, the factors may not be helpful at all. *Id.* at 150, 119 S.Ct. at 1175. For example, in *First Tennessee Bank National Association v. Barreto*, 268 F.3d 319 (6th Cir.2001), the Sixth Circuit concluded that the *Daubert* factors were not helpful in determining the admissibility an expert's testimony regarding whether the plaintiff followed prudent banking practices. The court reasoned that because the basis of the expert's testimony was his "own practical experiences throughout forty years in the banking industry," his opinions were not of a type that "lend themselves to scholarly review or to traditional scientific evaluation." *Id.* at 335.

The Court concludes that the *Daubert* factors are not particularly helpful in determining whether Willis' testimony is reliable because, as Defendants acknowledged at the hearing, his testimony is based largely upon his fifty or so years of experience in the shipbuilding industry. Being exclusively based upon experience, Willis' opinions are not of the type that are subject to scientific testing or verification or can be subjected to peer review. In this regard the testimony at issue here is similar to the testimony at issue in *First Tennessee Bank*. Thus, Defendants' arguments that Willis' testimony must be excluded because his opinions cannot be tested, verified, or subjected to peer review must be rejected. That does not mean, however, that his testimony is freely admissible, be-

cause the Court is still required to assess its relevance and to determine that the bases for his conclusions are reliable and will assist the jury in determining the issues in question.

## B.  Relevance

■ The Court first addresses the relevance inquiry because identifying the factual issues in contention will enable the Court to hone in on the permissible areas of expert testimony. To be relevant the expert's testimony must "fit" the case, or, in other words, be tied to the facts closely enough to be of use to the trier of fact in resolving the issues in contention. *Daubert,* 509 U.S. at 591–92, 113 S.Ct. 2786. The "fit" in this case is informed by the Court's recent Opinion and Order on the parties' cross motions for summary judgment. Pursuant to the Court's rulings in that Order and the parties' admissions cited in the Opinion, the following facts are established as a matter of law: (1) in November 1999 the parties entered into an agreement pursuant to which BSC would construct the hull of the Dredge for $1.00 per pound and the deckhouse for $1.15 per pound; (2) in January 2000 the parties converted the agreement to a T & M agreement for all work which continued in effect through September 2000 when BSC completed its work on the Dredge; (3) BSC's Price Schedule supplied the rates, terms, and conditions for the T & M agreement; (4) the parties never reached a not-to-exceed agreement; and (5) LMC's defective coatings claim was untimely under the terms of the Price Schedule. With these facts defining the parameters of the case, the only issues in contention are those set forth in the complaint, namely, whether BSC breached the T & M agreement by: (1) failing to adhere to a schedule; (2) failing to construct the Dredge entirely within the covered fabrication shop; and (3) failing to perform the work in a timely, cost effective manner. (Compl.¶ 5.)

Willis' opinions and conclusions in his Initial Report meet the "fit" requirement because they pertain to the issues in dispute. Whether BSC properly billed LMC under the Price Schedule, whether BSC charged LMC for BSC-responsible rework, whether LMC incurred extra costs because of the early move-out of the Dredge from the covered fabrication shop, and whether the hours billed by BSC properly reflect the level of efficiency (or inefficiency) BSC achieved on the project would all be proper areas of expert testimony.

In contrast to his Initial Report, much of Willis' Supplemental Report fails to meet the "fit" requirement because Willis relies upon facts or assumptions having nothing at all to do with this case. In fact, portions of the Supplemental Report are so far afield that one familiar with the facts in this case would be compelled to wonder after reading the report whether it was prepared for a different case. For instance, Willis concludes on his own that the parties initially agreed that BSC would construct the hull and the deckhouse for a fixed amount of $1,266,200, in spite of admissions by LMC and BSC that they initially agreed on $1.00 and $1.15 per pound for the hull and deckhouse, respectively. Willis also ignores admissions by both parties that the agreement was converted to a T & M basis in January 2000 when he renders an unfounded and inadmissible legal conclusion that there is "no document or other evidence of any agreement by the parties regarding any form of Time and Materials (T & M) contract for work on the Dredge." (Supplemental Report at 4.) Other portions of the Supplemental Report do not fit with the facts of the case because the Court has made certain rulings as a matter of law. For example, the Court

has ruled that the parties had a T & M agreement governed by BSC's Price Schedule and that the parties did not reach a $4 million not-to-exceed agreement in April 2000 as alleged by LMC. While the ruling on the alleged $4 million not-to-exceed agreement only affects a minor portion of the report, the Court's ruling that the Price Schedule applies to the parties' T & M agreement renders most, but not all, of the Supplemental Report irrelevant. In particular, the Court concludes that:

1. Willis' specific conclusions and opinions under paragraphs 3.a. to .3.c. are irrelevant and thus inadmissible because they are based upon Willis' conclusions that the original agreement was a fixed-price agreement for construction of the hull and deckhouse, there was no T & M agreement, and the Price Schedule does not apply. Because the Price Schedule applies, average labor rates and charges for U.S. shipyards are irrelevant.

2. The conclusions and opinions in paragraph 3.d. regarding BSC-responsible rework are relevant to the extent they merely restate the opinions and conclusions from paragraph 3.b. of the Initial Report regarding BSC-responsible rework. They are irrelevant to the extent they incorporate Willis' conclusions mentioned in paragraph 1 above. Similarly, the opinions in paragraphs 3.e. (extra work and costs caused by early move-out) and 3.f. (reduced efficiency) are relevant to the extent they merely restate the opinions and conclusions from the corresponding paragraphs of the Initial Report (3.c. and 3.d.) or supplement the bases for those conclusions and opinions but are irrelevant to the extent they are based on or incorporate Willis' conclusions and opinions in paragraphs 3.a. to 3.c.

3. Willis' opinion in paragraph 3.g. regarding the fair market value of BSC's labor hours is irrelevant.

4. Willis' opinions in paragraphs 3.h.(i) to (vi) regarding adjustments of BSC's charges for materials, subcontracts, and equipment usage and Willis' opinions in paragraphs 3.i. and 3.j. are irrelevant because they are not pertinent to the facts or issues in this case.[1]

5. Willis' opinions in paragraph 4.A. regarding new work items and changes to work items after May 16, 2000, are irrelevant because the Court has concluded that there was no $4 million not-to-exceed agreement.[2]

6. Willis' opinion in paragraph 4.B. regarding the cost to complete the

---

**1.** The adjustments in paragraph 3.h. are for: (1) charges for the fixed-price hull and deckhouse construction; (2) other BSC-responsible adjustments; (3) non-Dredge purchase orders; (4) salvage material credit; (5) production support materials; and (6) adjustment to determine BSC's actual costs. (Supplemental Report at 37–42.) Willis' opinion regarding non-Dredge purchase orders is relevant to the issues in this case, but expert testimony is not required on that issue. Whether the materials reflected in those purchase orders were used on the Dredge is a question better answered by a fact witness.

**2.** The Court also notes that the factual basis for Willis' opinion is incorrect. LMC alleged that the $4 million not-to-exceed agreement was reached on or about April 17, 2000, and on that basis argued in its motion for partial summary judgment that BSC would be entitled to be paid for new work and changes to existing work after April 17, 2000. Willis' opinions and conclusions are for work after May 16, 2000—a full month after the alleged agreement.

Dredge at a shipyard in Canada is irrelevant.

7. Willis' opinion in paragraph 4.C. (second 4.B) regarding a reasonable price under a T & M agreement is irrelevant because it is not based upon the rates in BSC's price schedule.

## C. Reliability

In considering whether Willis' testimony and opinions are sufficiently reliable to be helpful to the trier of fact, the Court finds guidance in the following statement from the advisory committee's notes to the 2000 amendment to Rule 702:

> Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.
>
> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

Fed.R.Evid. 702, advisory committee's note (citations omitted). Applying these principles, the Court will examine each area of Willis' testimony for reliability. As a preliminary matter, however, it should be noted that BSC does not dispute that Willis is qualified to testify as an expert witness about such matters as shipbuilding practices and factors affecting shipbuilding efficiency. Willis has over 50 years of experience in the shipbuilding industry at various levels of responsibility, including 13 years as a civilian employee with the United States Navy and 12 years of experience with Newport News Shipbuilding, during 6 of which he has served as the director of contracts with responsibility for administering all government and commercial contracts (except repair). (Willis Summary Curriculum Vitae, Initial Report Ex. 1.) In addition, Willis developed the method of analyzing shipyard efficiency which serves as the model for NAVSEA, the United States Navy's disruption analysis methodology. (Willis Aff. ¶¶ 10, 21, Pl.'s Br. Opp'n Ex. 1.) Based upon his qualifications, Willis is qualified to opine on the matters set forth in the Initial Report.

### 1. BSC Labor Rates

In paragraph 3.a. of the Initial Report, Willis concludes that BSC overbilled LMC by $449,649 because BSC failed to charge LMC in accordance with the Price Schedule. The BSC Price Schedule states that labor is charged at the rate of $32.50 per hour and that one hour of supervision at the rate of $35 per hour will be charged for every ten hours of direct labor charged. Willis determined that this policy produced a composite hourly rate of $32.73 by dividing the charge for ten hours of labor and one hour of supervision by 11 hour ($325 + $35/11 = $32.73). This calculation is erroneous because BSC's composite hourly rate of $36 per hour is determined by using a denominator of 10 rather than 11 ($325 + $35/10 = $36). At the hearing, Willis testified that he was mistaken in this portion of his report because he misunderstood how the composite labor rate of $36 was calculated. (5/7/02 Hr'g Tr. at 44–45.) In fact, Willis testified that he had retracted "[e]very bit" of his opinion in paragraph 3.a. (*Id.* at 46.) Therefore, Willis' conclusions regarding BSC's

labor rates in paragraph 3.a. of his Initial Report are unreliable and, therefore, inadmissible.

### 2. BSC–Responsible Rework

■ In paragraph 3.b., Willis concludes that BSC is responsible for various items that were required to be reworked. LMC was charged for the additional work. Willis obtained information regarding these items from LMC representatives and opined that 132 straight-time hours of labor and $150 in material was required to complete the rework. Applying a 3.7% overtime rate and adding production support materials of $204 plus BSC's 15% material markup, Willis determined that LMC is entitled to a credit of $5,303. Although BSC did not raise a specific objection regarding this portion of the report, the Court concludes that this portion of the report should be excluded because, while Willis is certainly competent to make such a calculation, he fails to set forth the factual basis and methodology he used to arrive at 132 hours.

### 3. Extra Work and Costs Resulting from Early Move–Out

■ In paragraph 3.c. of his Initial Report, Willis discusses the effects of BSC's decision to move the Dredge out of the covered fabrication shop to the graving dock in May 2000, prior to completion of the Dredge. LMC alleges that BSC breached the agreement by failing to complete the Dredge in the covered shop. Willis states that "good shipyard practice would require that the Dredge's hull, deckhouses, exterior platforms, hatches, coamings, foundations for the A–Frame and deck equipment, and other similar work be completed before leaving the Fab Shop." (Initial Report at 9.) Willis estimates at the time of the move, the hull, deckhouses, and associated weather-sensitive work was approximately 75% complete. (*Id.* at 10.) Willis divides the effect of the early move-

out into four categories: (1) direct impact of early move-out; (2) weather-related efficiency losses; (3) added protection and clean-up due to rain days; and (4) added cleaning/coating caused by water intrusion. (*Id.* at 10–13.)

With regard to the first category, direct impact of the early move-out, Willis concludes that from May 10–15, 2000, when production was shut down, the Dredge was moved, and production was resumed, BSC was at most 50% efficient. According to Willis, efficiency was lost because BSC's workers were required to shut down their work for most of that time and had to remobilize once the Dredge was into place in the graving dock. Willis opines that the move resulted in 350 extra hours being charged to LMC at a total cost of $12,748. At the hearing, Willis elaborated on the process he used to determine the 50% efficiency rate:

> I went back and looked at the process that was followed, talked to the people on the scene, and evaluated the—as I started to—it's described to the best of my ability on page 10, subparagraph (i), where substantial extra labor was incurred because the work had to be shut down. They had to demobilize the work force, get the support facilities off the dredge, and remove the dredge from the facility, transport it down to the floating dock, and then transfer it again to the dry dock. During that period of time, the production workers that had been working on the dredge were not able to continue their normal processes. So they had to go somewhere else and come back to the dredge. And that, in my view, certainly introduces inefficiency.
>
> ... So Bay Shipbuilding had said during that period of time that it charged 705 manhours to the dredge. And so I assumed that meant 705 manhours had been worked on the dredge. And work-

ing them under those inefficiency conditions, it's my professional opinion that you would not achieve more than 50 percent of the efficiency.

(5/7/02 Hr'g Tr. at 48–49.)

The basic premise of Willis' opinion is sound: interruptions reduce work efficiency. That premise is a truism for any task, be it a simple household chore, a summary judgment brief, or an opinion on a motion in limine to exclude expert testimony. There is also a factual basis for Willis' opinion because there is no dispute that the move interrupted work being performed by BSC workers and that some of the 705 hours spent on the Dredge during the five-day period involved demobilizing— removing and disconnecting lines, removing materials and putting away tools, and cataloging drawings and other documents—and remobilizing. Finally, as noted above, Willis' experience, by itself, is sufficient to allow him to testify as an expert. *United States v. Kunzman*, 54 F.3d 1522, 1530 (10th Cir.1995). However, none of this means that the Court is required to accept Willis' testimony because he is an expert and says "it is so." *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir.1987)("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."). In other words, Rule 702 does not allow the Court to take Willis merely at his word, but rather requires an examination of both the "sufficiency of the testimony's basis" and "the application of a methodology to the facts" to ensure some degree of reliability. *Rudd v. Gen. Motors Corp.*, 127 F.Supp.2d 1330, 1336 (M.D.Ala.2001).

With regard to the basis of his opinion, Willis simply assumed that all 705 hours spent on the Dredge involved work that was necessarily interrupted by the move. There is no indication that Willis took into account whether any of the hours spent on the Dredge were related to the move it-

self—work which was not interrupted and which would have been required at some point even if all work was completed in the covered shop—or whether the move affected the efficiency of some trades more than others, for example, electricians versus painters or welders versus general shop workers. Nor did Willis provide a breakdown of what was occurring on the Dredge at the time of the move and how many of the 705 hours were allocable to those specific jobs. Because Willis did not consider these factors, the basis for his conclusions is insufficient. A more significant factor undermining the reliability of Willis' conclusion, however, is his inability to explain how he reached his 50% efficiency figure. In effect, Willis cannot be cross-examined on his conclusion and he admitted as much at the hearing. (5/7/02 Hr'g Tr. at 50–51.) As the Supreme Court has observed, an expert should be able to explain the link between the facts and the result:

[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997). That is precisely the case here. Because Willis cannot explain how he arrived at the 50% figure, as opposed to, say 45% or 65%, there is no way to test his opinion through cross-examination. In short, "there is simply too great an analytical gap." *Id.*

Willis next concludes that BSC suffered a 50% reduction in efficiency on each day there was rain between May 13 and

June 30, 2000.[3] Willis determined the number of rain days based upon United States Coast Guard records and the memories of LMC on-site representatives. Based upon his 50% efficiency figure, Willis determines that BSC charged LMC for 950 hours which produced no progress because of the rain, totaling $34,504. (Initial Report at 12.) The Court concludes that Willis' opinions and conclusions on this issue are unreliable and inadmissible. Willis admitted at the hearing that he had no idea when it rained on the days with reported rain. (5/7/02 Hr'g Tr. at 57–58.) Thus, as demonstrated by the hypothetical posed by the Court at the hearing, if it rained from 3:00 p.m. to 4:00 p.m., a worker whose shift was from 8:00 a.m. to 4:00 p.m. would be prevented from working only one hour. (*Id.* at 57.) Yet, Willis failed to explain how he allowed for such a scenario in reaching his conclusions. Instead, it appears that he simply assumed that BSC's efficiency was no more than 50% on any day when there was rain even if the rain had only a slight impact on the work. Willis' opinion is also unreliable because he did not account for differences in rain volume and the impact that rain might have had on the types of work to be performed. (*Id.* at 54.)

Willis next estimates that on each rain day during May and June, BSC expended 16 hours for protective measures and 24 hours for clean-up after the rain stopped. Willis determines that BSC charged LMC for a total of 640 hours, or $22,072, that would not have been required if the Dredge had been completed in the covered fabrication shop. (Initial Report at 12.) This opinion is unreliable for many of the same reasons the weather-related efficiency opinion is unreliable. Willis' opinion is really no more than speculation based upon assumed conditions that may or may

have not been present. For example, the amount of rain might have been slight on one day but heavy on another. Thus, clean-up would not have required the same number of hours on both days. In addition, in the rain days cited by Willis, there are two periods where it rained four days in a row. Thus, it is entirely possible that at least some protective measures put in place on May 16 would have remained in place until May 19 or 20 and it would have been unnecessary to expend 16 hours on all of those days. Finally, the opinion is inadmissible because Willis fails to explain how reached his conclusion that 16 hours of work for protective measures and 24 hours of clean-up were required for each rain day.

The final element of early move-out charges is added cleaning/coating work required because of water intrusion. Willis concludes that 1,200 hours of work were required to scrape up slurry created by rainwater mixed with dust, dirt, grinding residue, and other materials that could have otherwise been removed by vacuums, brushes, and brooms had the Dredge remained in the covered shop. Willis' opinion is based upon his personal observation of many of the affected areas, interviews with LMC's on-site representatives, and his experience in the shipyard industry. Although Willis' personal observations and interviews with LMC representatives provide a sufficient factual basis for his opinion, his conclusion suffers from the same infirmity as the others, namely, lack of any explanation of how he arrived at the 1,200 hour figure, other than by relying on his experience. Thus, this opinion is not admissible.

### 4. Reduced Efficiency

■ In paragraph 3.d., Willis concludes that on its work performed between April

---

**3.** Willis did not include rain days for July and August because the Dredge was essentially

closed-in and watertight by the end of June. (Initial Report at 11.)

19 and August 26, BSC was 30% less efficient than it would have been if: (1) BSC had kept the Dredge in the covered shop; (2) BSC had performed its normal production and control practices; and (3) LMC had avoided the concurrent design and construct method it used on the Dredge.[4] (Initial Report at 15.) Willis also concludes that LMC was responsible for one-third of the inefficiency, or 10%, thus requiring a 20% reduction in the number of hours incurred during that time. Willis cites the following factors as the basis of his conclusions: (1) BSC was not performing its normal and proven production control processes; (2) BSC's reduced level of supervision; (3) LMC's construction approach, which involved a substantial number of design changes and work additions and alterations as the final Dredge design evolved concurrently with its construction.

In his Supplemental Report, Willis concludes that BSC was at most 60% efficient for all hours spent on the Dredge from November 1999 through September 2000 and that LMC was responsible for one-quarter of the reduced efficiency, or 10%, requiring a 30% reduction in the number of hours charged to LMC. A major facet of Willis' analysis was his conclusion that BSC was only 68% efficient on its construction of the hull and deckhouse. Willis arrived at the 68% figure by dividing the number of hours BSC originally budgeted for construction of the hull and deckhouse under the fixed-unit price agreement ($1.00/$1.15 per pound) by the actual num-

ber of hours spent on the hull and deckhouse (19,633/28,897 × 100 = 67.9%).[5] In addition to the factors mentioned in his Initial Report, Willis cited BSC's sporadic, partial-hour, and partial-day use of many different employees and BSC internal documents in which BSC management assessed productivity problems and concerns as two additional reasons or factors for BSC's inefficiency.

The Court concludes that Willis' opinions regarding BSC's efficiency are unreliable for several reasons. First, Willis' opinions do not sufficiently account for the specific facts of this case. That is, while Willis makes general observations about what should normally occur in the course of a shipbuilding project, he does not tailor those considerations to what actually occurred between the parties. For example, one of the factors in Willis' inefficiency calculus was BSC's failure to perform its normal production planning and scheduling effort. Willis states that this failure contributed to wasted hours as a result of miscommunications between workers in different BSC production groups and work being done out-of-sequence. However, this was not a normal situation in which BSC was able to apply its "normal production planning effort." LMC never provided BSC with a detailed set of plans and specifications that would enable BSC to plan and coordinate material and labor needs and schedules on a "critical path" basis. Instead, LMC controlled the process and essentially spoon-fed BSC its work orders on a daily basis. (Letter from

---

4. Willis focused on the period after April 18 because the work prior to that time was defined by the working drawings produced by Tim Graul, LMC's naval architect, whereas there was not a similar level of definition after that date and BSC was forced to look to LMC for directions. (Initial Report at 14.)

5. As set forth above, Willis concluded in his Supplemental Report that BSC and LMC originally entered into a fixed-price contract for construction of the hull and deckhouse for $1,266,200. Willis determined that amount by multiplying the number of hours BSC budgeted for constructing the hull and deckhouse based on the original weight estimation by Tim Graul by the respective $1.00 and $1.15 per pound rates.

O'Hern to Kemma Walsh of 7/6/00, Defs.' Br. Opp'n Pl.'s Mot. Summ. J. Ex. L ("Job orders are being modified and added daily at the direction of your representatives.").) In these circumstances, it would be important to know whether and how each new job order or modification of an existing job affected other work or caused an increase or decrease in labor requirements. It would also be important to know whether and how delays in delivery of owner-furnished equipment affected BSC's ability to plan and schedule its work. While Willis did consider the changes and re-directions by LMC as a factor affecting BSC's efficiency, he did not identify specific instances where this factor came into play. In addition, he did not consider whether delays in delivery of owner-furnished equipment contributed to BSC's inefficiency.

The issue here is whether BSC spent too much time in constructing the Dredge. One way to make this determination would be to start by comparing BSC's actual hours against a baseline number, for example, the number of hours required to construct the Dredge under perfect conditions, that is, starting with a complete set of plans and specifications. The reasons for or causes of the variation could then be explained by comparing what should have occurred in the process under perfect conditions in terms of job sequencing and scheduling, use of labor, and ordering of materials, with what occurred during the actual construction. Another method, or possibly just a variation, which is similar to the process this Court uses for determining hours reasonably expended for attorney fee awards, would be to determine a reasonable number of hours for each separate job or task, compare it to the number of hours actually incurred for that job or task, and then determine what factors contributed to excessive hours on that particular job. Willis' approach, in contrast, starts with his conclusion that BSC was inefficient and then works backward for reasons to explain this conclusion without focusing in on the specific facts and circumstances of the case. In a case such as this, it is the particular facts rather than general conclusion that are important.[6]

Second, other than citing his extensive experience in the shipbuilding industry, Willis cannot explain the methodological basis for his conclusions. While Willis can cite the reasons why BSC was inefficient, he cannot explain how he arrives at the conclusion that BSC was 75% responsible and LMC was 25% responsible. According to Willis, his experience is enough:

Q: My original question, sir, was precisely what you did to make that allocation. Did you do any calculation whatsoever to get to the 25 percent/75 percent allocation?

A: 25–75, yes. One-third, two-thirds. One-quarter three-quarters.

Q: Any calculations?

A: I did not need to do calculations.

Q: Okay.

A: It was my professional judgment—and I've done it so long, I just have it in my head.

(5/7/02 Hr'g Tr. at 108.) In other words, "it is" because he says so. However, the analytical gap here is so great that *ipse dixit* alone cannot suffice to render the opinion reliable.

---

**6.** One of the inefficiency factors cited by Willis was BSC's sporadic, partial-hour, and partial-day use of employees. Willis determined that this was a problem by examining BSC Tally sheets. However, Willis' conclusion that BSC was the sole cause of this problem is based upon speculation because it is entirely possible that workers were pulled off jobs after only a few hours or minutes due to a change made by LMC. Willis did not consider whether this was a possibility, although the facts suggest that it could have been.

Finally, because Willis cannot describe the analysis he uses to reach his conclusion, he also cannot demonstrate that whatever that analysis is, it is reliably applied to the facts. Therefore, Willis' opinion will not assist the trier of fact and must be excluded as unreliable under Rule 702.

### Conclusion

For the foregoing reasons, the Court will grant Defendants' motion in limine and exclude Willis' testimony.

An Order consistent with this Opinion will be entered.