# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 09-3116/3649

_____

The Weitz Company,                           *
                                             *
        Appellee,                            *
                                             *
        v.                                   *
                                             *
MH Washington, et al.,                       *
                                             *
        Appellants.                          *

_____                    Appeals from the United States
                               District Court for the
Nos. 09-3118/3635              Western District of Missouri.
_____

The Weitz Company,                           *
                                             *
        Appellee,                            *
                                             *
        v.                                   *
                                             *
Summit Steel Fabricators,                    *
                                             *
        Appellant.                           *

_____

Submitted:  October 21, 2010
     Filed:  January 7, 2011

_____

Before MURPHY, BEAM, and BENTON, Circuit Judges.
_____

BENTON, Circuit Judge.

The Weitz Company, LLC, sued MH Washington, LLC, MacKenzie House, LLC, and Summit Steel Fabricators, Inc., for breach of contract. The jury returned verdicts for Weitz against MH Washington/MacKenzie House (for $981,976) and against Summit Steel (for $326,839). The jury also found for MH Washington/MacKenzie House on its breach-of-contract counterclaim against Weitz (for $285,400.07). The district court[1] denied post-judgment motions and awarded Weitz attorney's fees, costs, and pre-judgment interest. The defendants appeal the judgments, the denial of the post-trial motions, and the awards of attorney's fees, costs, and pre-judgment interest. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

From 2004 to 2006, the 46th & Washington Townhomes were constructed near the Country Club Plaza in Kansas City, Missouri. The project consisted of 18 units in three buildings: A, B, and C/D. The Weitz Company, LLC ("Weitz"), an Iowa company, was general contractor until terminated in September 2006. Summit Steel Fabricators, Inc. ("Summit"), a Texas corporation, was a steel subcontractor to Weitz pursuant to a written subcontract. MacKenzie House, LLC, a Colorado real estate company, was the developer of the project, and the managing member of MH Washington LLC (a combination of the initials for MacKenzie House and the Washington Street location of the project).

_____

[1]The Honorable David Gregory Kays, United States District Judge for the Western District of Missouri.

The project was built pursuant to a "prime contract" consisting of two contract documents published by the American Institute of Architects. AIA Document A111 is a standard form agreement between owner and contractor on large projects requiring a guaranteed maximum price, when the basis of payment to the contractor is the cost-of-work plus a fee. A111 adopts by reference AIA Document A201, "General Conditions of the Contract for Construction." A201 sets forth the rights, responsibilities, and relationships of the owner, contractor, and architect. The A111 contract at issue here states that it is between Weitz and "the Owner" MH Washington, LLC. It is signed by Don MacKenzie as President of MH Washington. However, the A201 "General Conditions" contract (incorporated by reference in the A111 contract) states that the "THE OWNER" of the project is MacKenzie House LLC.[2]

Weitz subcontracted most work on the project. After the prime contract was signed, Weitz began seeking proposals from its list of pre-qualified subcontractors with whom it had prior good outcomes. However, MH Washington had final authority over which subcontractors were used. After seeing several bids from Weitz's trusted subcontractors, MH Washington informed Weitz that the bids were too high and began soliciting subcontractors on its own.

After receiving the reduced bids, Weitz was concerned that the new subcontractors' excessively low bids (in Weitz's opinion) created risks of higher costs in the long run for the project. For example, defendant Summit's steel subcontract bid was $115,000 lower than the next bidder. Weitz sent MH Washington a risk analysis quantifying the risks of using low-cost subcontractors. MH Washington insisted on using the cheaper subcontractors, some of which could not obtain performance bonds.

---

[2] The parties dispute whether MacKenzie House is a party to the construction contract and whether MH Washington is an alter ego of MacKenzie House. For ease of reference, this opinion uses "MH Washington" to refer to the other party to the contract with Weitz.

Weitz and MH Washington eventually modified the prime contract by adding a non-standard Article 10.4 to the A111 contract: "[I]n recognition of the fact that the Owner has requested that Contractor not require that its subcontractors provide performance and payment bonds, Owner agrees to accept all risk for the performance and payment defaults of the Contractor's subcontractors in the performance of the Work . . ."

After work on the project began, it became apparent the scheduled completion date of October 24, 2005, was likely to be delayed. Weitz attributed these delays to shoddy work and lack of personnel by the cheaper, high-risk subcontractors; MH Washington blamed mismanagement by Weitz. More than once, Weitz advanced the costs of hiring replacement subcontractors to correct and complete work.

Summit Steel Fabricators was one of the subcontractors selected by MH Washington that fell behind schedule and performed defective work on the project. Summit was hired to fabricate and install ornamental steel and steel balcony decks, stair treads, handrails, and the like. During the summer of 2005, Summit received written notice that its work was noncompliant. Testimony at trial showed that Summit's work included defective welds, deformed steel, stairways and other steel elements that did not fit the opening provided, handrails that wobbled, and a general lack of personnel, equipment, and quality work. In October 2005, Weitz forwarded an architect's report to Summit documenting a number of defects with Summit's work, characterized as "typical in all units." Weitz issued two formal "failure to perform" notices to Summit that provided an option to cure. Weitz terminated Summit's contract in November 2005. Weitz eventually paid more than $325,000 to have the defects in Summit's work repaired.

The Summit subcontract called for progress payments as its work on the project proceeded, and Summit was paid periodically. The project's progress-payment system required Summit and the other subcontractors first to file an application for payment with Weitz certifying that work had been done. Then, Weitz submitted

-4-

applications for partial payments certifying to MH Washington that "to the best of the Contractor's knowledge, information, and belief," the work was completed in accordance with the subcontract. In response to the progress payments, Weitz executed lien waivers, releasing in favor of MH Washington any related liens Weitz had on the project property. Pursuant to this partial-pay process, Summit Steel was paid $212,534.00 of an original subcontract sum of $227,486.00, and was certified to have completed 91 percent of its work.

In contrast, Weitz itself was not paid on time. Although the parties dispute who breached first, the jury and district court believed that MH Washington first breached the prime contract by withholding $701,876 in payment from Weitz. Weitz intended to use this money to pay several subcontractors. Because Weitz failed to pay on time, several subcontractors filed mechanic's liens on the property. Weitz offered MH Washington lien bonds in exchange for releasing payments to Weitz, an arrangement the architect endorsed. However, MH Washington declined to resume scheduled payments to Weitz, even after several mechanic's liens were released. The chicken-and-egg cycle was completed by MH Washington's suspension of future payments to Weitz due to the liens, pursuant to a provision in the prime contract that obligated Weitz to keep the project free from liens.

Although delays and acrimony plagued the project, eventually it was completed. Temporary Certificates of Occupancy were issued for all units between December 2005 and February 2006. Sales of most of the townhomes closed between January and March of 2006. However, for each building, work remained on the "punch list"—the report of unfinished work identified during an inspection by the owner and contractor just before completion of a building. In the midst of continuing disputes over payment and completion of the final punch-list items on two of the three buildings, MH Washington terminated the prime contract with Weitz in September 2006.

By July 2006, Weitz had already sued, alleging that MH Washington/MacKenzie House breached the contract by: 1) failing to pay Weitz for base scope work it performed; 2) failing to pay Weitz for change order work (changes to the scope of the work originally agreed to) that MH Washington/MacKenzie House directed Weitz to perform; and 3) improperly terminating Weitz.

In early 2007, MH Washington counterclaimed against Weitz for breach of contract, seeking liquidated damages and costs to complete. According to MH Washington, Weitz's mismanagement caused the liens to be filed on the project, removing any obligation of MH Washington to pay Weitz under the contract. The liens and shoddy workmanship on the project, in turn, gave MH Washington grounds to terminate Weitz for cause, removing any further contractual obligation to pay Weitz. Weitz then brought third-party actions against five subcontractors on the job, including Summit Steel, for breach of contract, indemnity, and contribution.

After a three-week trial, the jury returned verdicts in favor of Weitz against MH Washington/MacKenzie House (for $981,976) and against Summit Steel (for $326,839), and in favor of MH Washington on its breach-of-contract counterclaim (for $285,400.07). The district court set off the amounts owed between MH Washington/MacKenzie House and Weitz, and entered an amended judgment in favor of Weitz for $696,575.93. The district court denied post-judgment motions and awarded Weitz attorney's fees and costs from both MH Washington/MacKenzie House and Summit Steel. Pre-judgment interest was awarded to Weitz from MH Washington/MacKenzie House pursuant to Missouri's Prompt Payment Act for a contractor who is "the prevailing party" in an action for payment of amounts scheduled for payment.

The defendants appeal the underlying judgments, the post-trial motions, and the awards of attorney's fees, costs, and pre-judgment interest.

II.

MacKenzie House argues that it is entitled to judgment as a matter of law or, alternatively, a new trial because the district court should have ruled that it was not jointly and severally liable for the judgment against MH Washington.

Weitz counters that this court need not reach this issue, as MacKenzie House is a named party to the contract. The A201 half of the prime contract, incorporated by reference into A111, states on its face that the "THE OWNER" of the project is MacKenzie House. Weitz further notes that MacKenzie House directed all work on the project as an owner would, and referred numerous times to itself as a party to the contract. Section 2.1.1 of the A201 contract states that "[t]he Owner is the person or entity identified as such in the Agreement" and that "the term 'Owner' means the Owner or the Owner's authorized representative."

On the other hand, the A111 half of the prime contract states that it is between The Weitz Company and "the Owner" MH Washington, and is signed by Don MacKenzie in his capacity as President of MH Washington (MacKenzie is also President and CEO of MacKenzie House). Accordingly, MacKenzie House concludes that it is not a party to the prime contract and cannot be held liable for any breach by MH Washington, citing the general rule that one is not liable for breach of a contract to which one is not a party. *See Kahn v. Prahl*, 414 S.W.2d 269, 278 (Mo. 1967).

A signature is not essential to the binding force of an agreement; whether an unsigned writing is binding depends on the parties' intent. *Robinson v. Powers*, 777 S.W.2d 675, 679 (Mo. App. 1989). Because intent is a state of mind seldom capable of direct proof, the trier of the facts usually decides the question of intent. *Collins v. Swope*, 605 S.W.2d 538, 540 (Mo. App. 1980). A contract is ambiguous when its terms are susceptible of more than one reasonable meaning. *Chehval v. St. John's Mercy Medical Center*, 958 S.W.2d 36, 38 (Mo. App. 1997). There is ambiguity

-7-

whether an individual is liable on a contract when the form of the signature is inconsistent with the liability assumed under the terms of the agreement. *Wired Music, Inc. of the Great Midwest v. Great River Steamboat Co.*, 554 S.W.2d 466, 468 (Mo. App. 1977).

The district court ruled that MH Washington was either in a principal-agent relationship with MacKenzie House, or its alter ego, and the jury did not consider the factual question whether the parties intended MacKenzie House to be a party to the contract. Because the contract is ambiguous whether a non-signer named as the Owner is liable, and the parties' intentions are in dispute, this court declines to resolve this question of fact.

Deciding MacKenzie House's and MH Washington's pre-trial motion for partial summary judgment, the district court ruled that Weitz's pleadings and discovery evidence sufficiently alerted MacKenzie House to Weitz's alter ego/principal-agent theories of liability. At the close of the evidence, the district court ruled that MacKenzie House and MH Washington would be jointly liable to Weitz if the jury were to find that MH Washington breached the contract with Weitz. After trial, the district court denied MacKenzie House's renewed motion for judgment as a matter of law on this issue.

This court reviews de novo a district court's denial of a motion for judgment as a matter of law. *Chalfant v. Titan Distribution, Inc.*, 475 F.3d 982, 988 (8th Cir. 2007). Judgment as a matter of law is granted only if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). This court grants the nonmoving party all reasonable inferences and views the facts in the light most favorable to the nonmoving party. *Chalfant*, 475 F.3d at 988.

-8-

The denial of a motion for a new trial is reviewed for abuse of discretion. *Chalfant*, 475 F.3d at 988. The district court's decision will not be reversed unless there is a clear showing that the outcome is "against the great weight of the evidence so as to constitute a miscarriage of justice." *Foster v. Time Warner Entm't Co.*, 250 F.3d 1189, 1197 (8th Cir. 2001).

The evidence at summary judgment and at trial showed that MacKenzie House was intimately involved in all aspects of the project. Directions to Weitz were printed on MacKenzie House letterhead and reference "the original agreement made between MacKenzie House, LLC and The Weitz Company." The A201 half of the prime contract, incorporated by reference into A111, states on its face that the "THE OWNER" of the project is MacKenzie House, LLC. Routine correspondence about the project was on MacKenzie House letterhead and identified MacKenzie House as an "Owner." MacKenzie House participated in construction meetings as an owner and issued meeting notes on its letterhead. MacKenzie House was the entity that terminated the contract with Weitz, via letter signed by Don MacKenzie as President and CEO of MacKenzie House. The termination letter mentions MacKenzie House's involvement with the project several times. It is undisputed that MH Washington has no employees of its own, and shares the same Colorado office as MacKenzie House.

A.

As a general rule, two separate corporations are regarded as distinct legal entities, even if the stock of one is owned partly or wholly by the other. *Mitchell v. K.C. Stadium Concessions, Inc.*, 865 S.W.2d 779, 784 (Mo. App. 1993). Normally, a parent corporation is not responsible for the acts of its subsidiary corporation. *Grease Monkey Int'l, Inc. v. Godat*, 916 S.W.2d 257, 262 (Mo. App. 1995). However, where one corporation so dominates and controls another that it becomes a mere "alter ego" of the first and the formal corporate separateness is used to accomplish a fraud, injustice, or some unlawful purpose, then the separate formal

-9-

corporate structures are ignored.  *Collet v. American Nat'l Stores, Inc.*, 708 S.W.2d 273, 283-83 (Mo. App. 1986); *see also* **Radaszewski v. Telecom Corp.**, 981 F.2d 305, 306 (8th Cir. 1992) (citing *Collet* as the leading case in Missouri on the requirements for alter ego liability).

> To "pierce the corporate veil" under Missouri law, one must show:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Collet*, 708 S.W.2d at 284.  The element of "control" requires analysis of several factors that indicate the degree of control held by the dominant corporation:

> (1) The parent corporation owns all or most of the capital stock of the subsidiary.
> (2) The parent and subsidiary corporations have common directors or officers.
> (3) The parent corporation finances the subsidiary.
> (4) The parent corporation subscribes to all of the capital stock of the subsidiary or otherwise causes its incorporation.
> (5) The subsidiary has grossly inadequate capital.
> (6) The parent corporation pays the salaries and other expenses or losses of the subsidiary.
> (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

-10-

(8) In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.
(9) The parent corporation uses the property of the subsidiary as its own.
(10) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.
(11) The formal legal requirements of the subsidiary are not observed.

*Id.*  A finding of control is insufficient by itself to impose liability on the dominant corporation.  *Id.*  Control must have been used in an improper manner, such as to perpetrate fraud or injustice, or accomplish some unlawful purpose.  *Id.*  Examples of wrongs that satisfy this standard include actual torts, violations of statutory duties, undercapitalization, or the stripping of assets from the subservient corporation.  *Id.*

The control and causation elements are satisfied here.  MacKenzie House, a purported non-party to the contract, is the managing member of MH Washington and directed all aspects of the project, including any acts that give rise to a breach of the contract.  MacKenzie House participated in construction meetings as an owner, identified itself as the project owner in correspondence and in the A201 contract, and was the entity that terminated the contract with Weitz.  The President of each company is Don MacKenzie.  MH Washington has no employees of its own, and shares the same Colorado office as MacKenzie House.

At issue is the second element of the *Collet* test, whether control was used "to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights."  *Collet*, 708 S.W.2d at 284.  Weitz argues that MacKenzie House's causing MH Washington to breach the prime contract resulted in "the violation of a . . . positive legal duty."  *Id.*  Weitz asserts that by creating MH Washington as a shell LLC and listing it as an owner in the contract, MacKenzie House intended to use the separate corporate form

as a subterfuge to defraud creditors.  A court may disregard a separate corporation if the separateness is used to defraud a creditor.  ***Sansone v. Moseley***, 912 S.W.2d 666, 669 (Mo. App. 1995).  One badge of fraud is the transfer of property by the debtor corporation to a second corporation under common control.  ***Edward D. Gevers Heating & Air Conditioning Co. v. R. Webbe Corp.***, 885 S.W.2d 771, 773 (Mo. App. 1994).    Further, the jury's finding that MH Washington failed to pay its contractually-owed debts to Weitz when scheduled supports finding that the breach is a "dishonest and unjust act in contravention of plaintiff's legal rights." ***Collet***, 708 S.W.2d at 284.  "Making a corporation a supplemental part of a economic unit and operating it without sufficient funds to meet obligations to those who must deal with it would be circumstantial evidence tending to show either an improper purpose or reckless disregard of the rights of others." ***Id.*** at 287.

However, there is little evidence here as to when MH Washington was created, the extent of its initial capitalization, or whether it is the title owner of the project property.  Because the record is unclear on these basic facts and Missouri law does not state that a breach of contract by the controlled corporation caused by the dominant corporation satisfies *Collet*'s second prong, this court cannot express an opinion whether the veil-piercing requirements were met in this case.

B.

In order to establish a principal-agent relationship between two corporations, "there must be such domination and control that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal." ***Sedalia Mercantile Bank and Trust Co. v. Loges Farms, Inc.***, 740 S.W.2d 188, 202 (Mo. App. 1987) (quoting ***Blackwell Printing Co. v. Blackwell-Wielandy Co.***, 440 S.W.2d 433, 437 (Mo. 1969).  To hold a parent liable for its subsidiary's acts, "the control must be actual, participatory and total." ***Sedalia***, 740 S.W.2d at 202-203.  Normally, whether a principal-agent relationship exists is a

-12-

question for the jury, but when the facts are undisputed and only one reasonable conclusion can be drawn from them, it is a question of law. *Id.* at 202.

The parties dispute whether in Missouri, alter ego veil-piercing liability and agency liability are distinct claims, or whether they are the same legal theory. MacKenzie argues that if alter ego liability and principal-agent liability are distinct claims, Missouri's veil-piercing cause of action is eliminated. Under this view, the *Collet* tripartite test to establish a corporate-veil claim (control + two elements) would never need to be satisfied if the agency theory is available, because agency liability requires only the control element. Admittedly, there is language in some Missouri cases that obscures the distinction or does not mention both. *See, e.g.*, **Hefner v. Dausmann**, 996 S.W.2d 660, 664 (Mo. App. 1999) ("A parent corporation is not responsible for the acts of its subsidiary except where the wronged party pierces the corporate veil."); **Grease Monkey**, 916 S.W.2d at 262 ("Two separate corporations may be treated as one only where there is such dominion and control that the controlled corporation has no separate mind, will or existence of its own and is but an alter ego for its principal.").

On balance, Missouri law is settled that alter ego liability and agency liability are separate causes of action. *See, e.g.*, **Blackwell Printing Co.**, 440 S.W.2d at 437 (noting that ownership of one corporation's stock by another is not enough to establish alter ego *or* "relation of principal and agent"); **Mid-Missouri Tel. Co. v. Alma Tel. Co.**, 18 S.W.3d 578, 582 (Mo. App. 2000) (referencing both theories in discussion of corporate control); **Ritter v. BJC Barnes Jewish Christian Health Systems**, 987 S.W.2d 377, 384-85 (Mo. App. 1999) (conducting two separate analyses with two separate holdings); **Reis v. Peabody Coal Co.**, 997 S.W.2d 49, 73 (Mo. App. 1999) (referencing both the "piercing the corporate veil exception" *and* the "agency exception" to the general rule of parent companies' non-liability for acts of subsidiaries).

The district court's ruling that MH Washington and MacKenzie House are in a principal-agent relationship within the meaning of *Sedalia* is well-supported by the evidence. MH Washington was only a business conduit for MacKenzie House, and the control of MH Washington was "actual, participatory and total." *Sedalia*, 740 S.W.2d at 202-203. The district court did not err or abuse its discretion in entering judgment for Weitz on this issue.

III.

MH Washington challenges several of the district court's rulings: 1) allowing argument to the jury about differing interpretations of Article 4.4 of the prime contract, the liquidated damages provision; 2) finding the evidence sufficient to support the jury's findings that Weitz substantially performed the contract and that MH Washington breached the contract; 3) permitting Weitz's counsel and witnesses to reference Article 10.4 of the prime contract, when it was not a potential source of liability for MH Washington; and 4) admitting the testimony of Weitz's expert on the source of construction delays over a *Daubert* objection. Finally, MH Washington argues that the district court abused its discretion by granting Weitz attorney's fees, costs, and pre-judgment interest.

A.

MH Washington seeks a new trial, contending that the district court should not have allowed argument about two different interpretations of Article 4.4 of the prime contract. When a district court overrules a party's objection to an opposing party's closing argument, this court reviews for an abuse of discretion and reverses only where counsel's statements are "plainly unwarranted and clearly injurious." **Harris v. Steelweld Equip. Co.**, 869 F.2d 396, 404-05 (8th Cir. 1989). Denial of a motion for a new trial is reviewed for abuse of discretion. **Chalfant**, 475 F.3d at 988. The district court's decision is not reversed unless there is a clear showing that the

-14-

outcome is "against the great weight of the evidence so as to constitute a miscarriage of justice." *Foster*, 250 F.3d 1189, 1197 (8th Cir. 2001).

The prime contract set liquidated damages at the rate of $500 per building, per day, for every day starting 15 days after the scheduled completion date (until each building was completed). Article 4.4 defines "completion of a building" as the latest of three dates: 1) when a final or temporary certificate of occupancy is issued for a building; 2) when the building is ready to be sold to the public and all areas adjacent to it are ready for their intended use; or, 3) "the date upon which all *related* Punch-List Items shall have been completed." (emphasis added).

A series of change orders extended the deadline for completion of work to October 24, 2005, but the project was not complete by then. Each building in the project received a Temporary Certificate of Occupancy ("TCO") when nearing completion. Building C/D received a TCO on December 30, 2005; Building B on January 13, 2006; and Building A on February 24, 2006. As part of its counterclaim, MH Washington sought liquidated damages for late completion of the project. The parties agreed that the controlling end date for the liquidated damages calculation was the date on which all punch-list items were completed for the buildings. The work on the punch-list for Building A was completed September 6, 2006, 306 days late; the B punch-list was completed January 11, 2007, 433 days late; and the C/D punch-list was completed December 15, 2006, 406 days late.

In its summary judgment order, the district court held that the plain meaning of Article 4.4 is that a building was not completed until the punch-list items were completed. However, the order did not address when a punch-list should be deemed "completed." During closing arguments, Weitz argued that the word "related" in Article 4.4 narrows the type of punch-list work required for a building to be deemed "complete" to only those items "related" either to the issuance of a TCO for a building or the building's being deemed ready to be sold to the public. MH Washington argued

-15-

that this interpretation of Article 4.4 contradicted the plain meaning that the "related" punch-list items are the items related to the building whose completion date is being calculated.

During trial, the district court indicated that it had not previously ruled on the meaning of the phrase in question, allowed each party to argue its interpretation, and ruled that the jury would have to interpret the facts as they applied to Article 4.4. After trial, MH Washington moved for a new trial, objecting that this argument caused an incorrect damages calculation by the jury. MH Washington argued that punch-list work extended well after the issuance of the TCOs, so its liquidated damages were far more than the jury awarded. The district court denied the motion.

Under Missouri law, determining the meaning of an unambiguous provision is a question of law for the court, determined by giving language its plain and ordinary meaning without resort to extrinsic evidence. *Madsen v. Audrain Health Care, Inc.*, 297 F.3d 694, 698 (8th Cir. 2002). A contract is ambiguous when the terms are susceptible of more than one reasonable meaning. *Chehval v. St. John's Mercy Medical Center*, 958 S.W.2d 36, 38 (Mo. App. 1997). Interpretation of a contract is a jury question only when the court determines that the contract is ambiguous and that there exists a genuine factual dispute regarding the intent of the parties. *See Graham v. Goodman*, 850 S.W.2d 351, 354 (Mo. banc 1993).

Article 4.4 is ambiguous, as it is susceptible to each of the meanings argued by the parties. The district court did not abuse its discretion in refusing to halt the trial for argument and briefing on a new dispositive issue like the interpretation of the word "related." Given the ambiguity of the phrase and the dispute about the parties' intentions, it was proper for the jury to consider the meaning of "related," and to decide the date when each building was completed.

-16-

B.

MH Washington seeks a new trial, attacking the jury's finding that Weitz substantially performed the contract and MH Washington breached. Denial of a motion for a new trial is reviewed for abuse of discretion. *Chalfant*, 475 F.3d at 988.

To recover for breach of contract, a party must show its own substantial compliance with the contract. *Brockman v. Soltysiak*, 49 S.W.3d 740, 745 (Mo. App. 2001). "A party's performance under a contract is substantial if the deviation from the contract was slight and if the other party received substantially the same benefit it would have from literal performance." *Gilmartin Bros., Inc. v. Kern*, 916 S.W.2d 324, 329 (Mo. App. 1995). Whether a contract has been substantially performed depends on the facts and circumstances of the particular case. *In re Estate of English*, 691 S.W.2d 485, 489 (Mo. App. 1985).

According to MH Washington, Weitz breached the contract in several ways: Weitz was obligated to keep the project free from liens, yet 12 liens were filed on the project by subcontractors, totaling over $650,000. Weitz failed to complete the project within the contractual time frame. Weitz was required to have a project superintendent on site every day, but on numerous occasions no one from Weitz was present. Many witnesses testified that the quality of the work was poor, despite contractual requirements that the work be carried out in a good and workmanlike manner.

However, the jury heard evidence that many of these breaches were caused by MH Washington. Weitz put on evidence that it substantially complied with its obligations and that MH Washington used the presence of the liens as an excuse not to pay. The district court, awarding Weitz attorney's fees, costs, and pre-judgment interest, found that "there was substantial, more persuasive evidence at trial [] that MH Washington breached the contract first by wrongfully withholding $701,876 in

-17-

payment from Weitz, payment that would have been used to pay the subcontractors and prevent the liens from being filed." A party may not prevent another from performing on the contract and then sue for failing to perform. *See Smith Moore & Co. v. J.L. Mason Realty & Inv.*, 817 S.W.2d 530, 534-35 (Mo. App. 1991). In addition, temporary certificates of occupancy were issued for all three buildings before Weitz was terminated. The key issue for the jury was whether the delays and quality problems were the result of Weitz's mismanagement or the poor performance of the subcontractors MH Washington forced Weitz to use. Ample evidence supported the jury's verdict for Weitz.

MH Washington argues that the jury's finding that it breached the contract is unsupported by the record, because MH Washington was not contractually obligated to pay Weitz once liens were filed on the project. MH Washington also contends that once Weitz was terminated for cause, MH Washington could stop making payments because any unpaid balance was less than MH Washington's liquidated damages and costs-to-complete. However, Weitz's evidence was that it offered performance bonds to release the liens, but MH Washington refused such an arrangement. Given that MH Washington's main obligation was to pay Weitz for work on the project, and it is undisputed that MH Washington withheld payment of at least $700,000 from Weitz, the jury's verdict was not against the weight of the evidence.

C.

MH Washington argues that the district court abused its discretion in denying a new trial, alleging that the repeated references by Weitz and its witnesses to Article 10.4 of the contract suggested to the jury that MH Washington had liability to Weitz under a contractual provision that was not at issue. This court reviews evidentiary rulings for abuse of discretion, reversing only for a prejudicial abuse of that discretion that affected a party's substantial rights. *See Dahlgren v. First Nat'l Bank of*

*Holdrege*, 533 F.3d 681, 700 (8th Cir. 2008); Fed. R. Civ. P. 61. Denial of a new trial is reviewed for abuse of discretion. *Chalfant*, 475 F.3d at 988.

Article 10.4 is the contractual provision the parties drafted as a modification to the generic A201 contract in order to address Weitz's concerns about the cheaper, higher-risk subcontractors that MH Washington insisted upon:

> Notwithstanding anything herein to the contrary and in recognition of the fact that the Owner has requested that Contractor not require that its subcontractors provide performance and payment bonds, Owner agrees to accept all risk for the performance and payment defaults of the Contractor's subcontractors in the performance of the Work, and Owner agrees to defend, indemnify, and hold Contractor harmless from and against any claims, damages, losses and expenses including but not limited to attorney's fees and warranty work arising out of or in connection with the payment or performance defaults of the subcontractors.

MH Washington reasons that because Article 10.4 had no bearing on the determination of the issues at trial, references to it impermissibly affected their substantial rights by suggesting to the jury an alternate basis of liability. MH Washington concludes that these references should have been excluded as not relevant under Fed. R. Evid. 401, or because the probative value was outweighed by the danger of undue prejudice under Fed. R. Evid. 403. Before trial, the district court ruled that Article 10.4 is a guaranty provision under which Weitz may attempt recovery only in the future, and only if Weitz wins a judgment against an unbonded subcontractor and cannot recover on the judgment.

Article 10.4 was relevant, as a key issue for the jury was whether the delays and quality problems on the project were the result of Weitz's incompetence or the subcontractors' poor performance. Article 10.4 corroborated Weitz's suspicions of the unproven subcontractors and gave context to the problems that later developed on

-19-

the project.  The district court's order denying a new trial noted that given Weitz's allegation that the owner-requested subcontractors caused most of the problems on the project, "it is difficult to imagine how Weitz could have received a fair trial if it were not allowed to reference Article 10.4."  The district court did not abuse its discretion in allowing references to Article 10.4.[3]

D.

MH Washington claims that the district court should have excluded the testimony of Patrick W. Brannon, P.E., Weitz's retained expert witness, as unreliable. This court reviews a district court's ruling admitting expert testimony under Federal Rule of Evidence 702 for an abuse of discretion.  *United States v. Eagle*, 515 F.3d 794, 800 (8th Cir. 2008).  Denial of a motion for a new trial is reviewed for abuse of discretion.  *Chalfant*, 475 F.3d at 988.

Brannon is a construction engineer retained by Weitz to analyze responsibility for delays on the project by comparing the original project schedule with Weitz's contemporaneously updated schedules (events as they actually occurred).  Brannon used a methodology known as "windows analysis," which distinguishes activities on the "critical path," where a delay causes a delay in the overall project, and those activities with "float" time, where a delay does not affect the overall job.

---

[3] Any prejudice from references to Article 10.4 was blunted by MH Washington's uncontradicted closing argument:

> Weitz talked about 10.4.  Understand this, ladies and gentlemen, 10.4 has no part in this case.  There is not one single claim that's being asserted by any party that we or anybody else violated 10.4.  10.4 should not be considered by you in any part of your deliberation on any part of these claims.

The district court may admit the testimony of a witness whose knowledge, skill, experience, training, or education merits expert status if (1) the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, and (2) the evidence is relevant and reliable. *Eagle*, 515 F.3d at 800; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588-91 (1993). A district court enjoys broad latitude in determining reliability. *United States v. Kenyon*, 481 F.3d 1054, 1061 (8th Cir. 2007). If the court is satisfied with the expert's knowledge, skill, experience, training, or education, "and the expert's testimony is reasonably based" on that expertise, "the court does not abuse its discretion by admitting the testimony." *Id.* Nevertheless, the district court must exclude expert testimony if it is so fundamentally unreliable that it does not assist the jury; otherwise, the factual basis of the testimony goes to the weight of the evidence. *Larson v. Kempker*, 414 F.3d 936, 940-41 (8th Cir. 2005).

MH Washington argues that Brannon's analysis was unreliable because it allocated most of the work on the project to the "critical path" based on an original baseline schedule (Schedule Z) prepared by Weitz that did not distinguish "critical path" and "float" activities. Further, MH Washington objects that the baseline critical-path schedule Brannon used was his own creation, thus rendering unreliable any allocation of responsibility for delays to the entire project. Because Brannon could not definitively identify each particular activity on the project as either on or off the critical path, MH Washington believes that the expert testimony was wholly incapable of testing or verification, and thus unreliable. Before the district court, MH Washington invoked *RLI Ins. Co. v. Indian River Sch. Dist.*, No. 05-858, 2007 WL 4292109, at *5-7 (D. Del. Dec. 4, 2007), for the proposition that expert testimony that does not adequately identify the critical path should be excluded. Before this court, MH Washington points to cases where expert opinion on the responsibility for delays was excluded as unreliable. *See, e.g.*, *Lake Michigan Contractors, Inc. v. Manitowoc Co.*, 225 F.Supp.2d 791, 798-804 (W.D. Mich. 2002) (excluding expert analysis where the expert could not explain the link between the facts and the result,

testifying he "did not need to do calculations" because "I've done it so long, I just have it in my head.").

Weitz counters that Brannon testified that in his experience with similar projects, "near critical path" activities should be analyzed as critical, even though the contractor's initial schedule indicates a small amount of float associated with those activities. In addition, Weitz says that Brannon's baseline critical-path schedule was just a simplified working document derived from Weitz's original project schedule, a necessary step for the commonly-accepted windows analysis. Finally, Weitz notes that MH Washington did not retain its own expert to conduct a delay analysis.

In the pre-trial order allowing Brannon's testimony, the district court noted that despite "apparent weaknesses" in Brannon's analysis, "these weaknesses do not rise to the level of making his testimony unreliable." The district court distinguished *Indian River* because there the defendants had to dissect the expert's report page-by-page to determine what documents supported which conclusion, and the expert's methodology was "hardly apparent" because "[t]he bulk of the report is a poorly-organized time line of the project events, with analysis scattered throughout." *Indian River*, 2007 WL 4292109, at *5-7. By contrast, Brannon's report was sufficiently specific to allow MH Washington to identify specific documents that arguably demonstrated flaws in the delay analysis. The district court also distinguished the methodological quibbles of MH Washington (e.g., Brannon did not visit the construction site or interview subcontractors) from a situation where an expert is truly unable to explain the link between the facts and the result. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

The district court did not abuse its discretion in admitting Brannon's testimony. MH Washington's arguments about which activities should have been excluded from the "critical path" do not rise to the level of inherent unreliability, for at some point most construction activities become critical if they are all there is left to complete on the job. Expert opinion necessarily involves some speculation. *See Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760 (8th Cir. 2003) ("A certain amount of speculation is necessary, an even greater amount is permissible (and goes to the weight of the testimony), but too much is fatal to admission."). Similarly, Brannon's use of Schedule Z (which did not identify critical-path activities) to aid in deriving the critical-path schedule is a fact that bears more on the weight of Brannon's testimony, rather than the fundamental reliability of his analysis. *See Daubert*, 509 U.S. at 595 (noting that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

E.

MH Washington argues that the district court abused its discretion by granting Weitz attorney's fees, costs, and pre-judgment interest. An award of attorney's fees, expenses, costs, or pre-judgment interest is reviewed on appeal for an abuse of discretion. *Computrol, Inc. v. Newtrend, L.P.*, 203 F.3d 1064, 1072 (8th Cir. 2000) (attorney's fees and costs); *Children's Broadcasting Corp. v. Walt Disney Co.*, 357 F.3d 860, 868 (8th Cir. 2004) (pre-judgment interest). However, whether the district court had authority to grant pre-judgment interest is a question of state law, reviewed de novo. *Children's Broadcasting*, 357 F.3d at 868-69. Because this is a diversity action, state law controls the award of pre-judgment interest. *See Berglund v. State Farm Mut. Auto. Ins. Co.*, 121 F.3d 1225, 1230 (8th Cir. 1997).

1. Attorney's Fees

In a diversity action, state law governs the availability of attorney's fees where no conflicting federal statute or court rule applies. *Burlington Northern R. Co. v. Farmers Union Oil Co.*, 207 F.3d 526, 534 (8th Cir. 2000). In Missouri, attorney's fees are not recoverable from another party, except when allowed by contract or statute. *Trim Fit, LLC v. Dickey*, 607 F.3d 528, 532 (8th Cir. 2010) (citing *Essex Contracting, Inc. v. Jefferson Cnty.*, 277 S.W.3d 647, 657 (Mo. banc 2009); *First State Bank of St. Charles v. Frankel*, 86 S.W.3d 161, 175-76 (Mo. App. 2002) (noting that "a trial court may award attorney's fees to a prevailing party if a contract provides for the payment of attorney's fees and expenses incurred in the enforcement of a contract provision."). Under Missouri law, the reasonableness of attorney's fees is determined by examining the time expended; the nature, character and amount of the services rendered; the nature and importance of the litigation; the degree of responsibility imposed on the attorney; the amount of money involved; the degree of professional ability, skill, and experience called for and used; and the result obtained. *Roberts v. Rider*, 924 S.W.2d 555, 558-59 (Mo. App. 1996).

The district court granted Weitz $318,924.53 in attorney's fees pursuant to Missouri's Prompt Payment Act, which authorizes the award of attorney's fees and pre-judgment interest from the date payment was due to the prevailing party in certain construction disputes. Mo. Rev. Stat. § 431.180. The requirements for application of the Act are that: 1) the parties must have entered into a contract for construction work after August 28, 1995; and 2) the contract must have required scheduled payments which were not made. Mo. Rev. Stat. § 431.180; *Vance Bros., Inc. v. Obermiller Constr. Services, Inc.*, 181 S.W.3d 562, 564 (Mo. banc 2006) (per curiam).

MH Washington asserts that the second condition was not met: there were no scheduled payments under the contract, due to the mechanic's liens on the project property. This is essentially the same argument MH Washington made when

-24-

challenging the sufficiency of the evidence for the jury's finding that MH Washington breached the contract. The evidence at trial was that MH Washington withheld more than $700,000 it owed Weitz, and that the failure to pay Weitz caused the subcontractors to file the liens. MH Washington rejected Weitz's offer of lien bonds to release the liens. Further, the Act is a remedial statute and thus given a liberal interpretation. *Jerry Bennett Masonry, Inc. v. Crossland Constr. Co., Inc.*, 171 S.W.3d 81, 89 (Mo. App. 2005). Holding the Act inapplicable here would undermine its purpose of discouraging unnecessary litigation and ensuring that contractors are paid when due. The Prompt Pay Act applies to Weitz's claim for attorney's fees.

MH Washington contends further that attorney's fees, costs and interest should not have been awarded because it reasonably relied on the contract's plain language, citing *Walton Constr. Co. v. MGM Masonry, Inc.*, 199 S.W.3d 799 (Mo. App. 2006). In *Walton*, the trial court denied an application for attorney's fees and interest under the Prompt Payment Act, on the grounds that although the jury found that Walton breached the contract by withholding payment, Walton's conduct was not unreasonable. *Walton*, 199 S.W.3d at 803. The trial court's decision to withhold attorney's fees was not an abuse of discretion. *Id.* at 807-08. By contrast, the district court here found that even if there were some legitimate dispute over the precise amount owed, MH Washington acted unreasonably in withholding virtually all payment. There was no abuse of discretion here in awarding Weitz attorney's fees.

MH Washington next objects that the district court abused its discretion in awarding attorney's fees to Weitz as the "prevailing party," when the jury's verdict on MH Washington's counterclaim showed that Weitz breached the contract with MH Washington. However, the Prompt Payment Act allows attorney's fees only to "the prevailing party," not *any* prevailing party. *See* Mo. Rev. Stat. § 431.180. Weitz was the prevailing party against MH Washington under Missouri law, because it was the net prevailing party. *See, e.g.*, *Birdsong v. Bydalek*, 953 S.W.2d 103, 124-25 (Mo. App. 1997) (disagreeing with the premise that there can be more than one "prevailing

party"); ***Ozias v. Haley***, 125 S.W. 556, 557 (Mo. App. 1910) ("It transpires frequently that in the verdict each party wins on some of the issues and as to such issues he prevails, but the party in whose favor the verdict compels a judgment is the prevailing party. Each side may score, but the one with the most points at the end of the contest is the winner."). There was no abuse of discretion in awarding Weitz attorney's fees.

In a related vein, MH Washington argues that the district court abused its discretion in denying MH Washington its attorney's fees as a prevailing party under the Prompt Payment Act, as it prevailed on its counterclaim against Weitz. MH Washington says that its attorney's fees and expenses were a component of its actual damages flowing from Weitz's breach of contract (because it had to defend against the subcontractors' lien actions). MH Washington clams that it did not argue or seek to have its attorney's fees submitted to the jury at trial because the district court's summary judgment order stated that it would "decide the amount of any award for attorney's fees and costs after trial." The quotation is entirely out of context, and comes from the district court's discussion whether *Weitz's claim* for attorney's fees and expenses under the *Weitz-Summit Steel* subcontract should be submitted to the jury. The district court at summary judgment never considered the separate question whether the jury should consider MH Washington's purported claim for attorney's fees as damages flowing from Weitz's breach of the contract. Except for the out-of-context quotation from the summary judgment order, this court would consider this argument waived as MH Washington did not seek to put its attorney's fees in evidence as damages flowing from the breach of contract. *See **Badami v. Flood***, 214 F.3d 994, 998 (8th Cir. 2000) ("In order to challenge a trial court's exclusion of evidence, the issue must be preserved for appeal by making an offer of proof on the record."). Assuming this issue was properly presented to the district court during trial and preserved for appeal, the district court did not abuse its discretion in denying MH Washington attorney's fees where the evidence at trial showed that MH Washington breached the contract first and was not the net prevailing party.

-26-

As to the amount of the award, it was not an abuse of discretion to award Weitz $318,924.53. This was a complex, multi-party dispute where the parties' legal strategy was characterized by the district court as "a concede nothing, litigate everything attitude which predictably resulted in the cost of litigation rivaling the amount in dispute." "A party cannot litigate tenaciously and then be heard to complain about the time necessarily spent overcoming its vigorous defense." *Williams v. Fin. Plaza, Inc.*, 78 S.W.3d 175, 187 (Mo. App. 2002) (internal quotation marks and citation omitted). Given the volume of motions and briefs filed, number of depositions, number and complexity of issues, and 13-day trial, the district court did not abuse its discretion in the amount of fees awarded.

### 2. Costs

The district court awarded Weitz $46,454.54 in costs against MH Washington. Under Fed. R. Civ. P. 54, the prevailing party in a lawsuit is presumptively entitled to its costs. *In re Derailment Cases*, 417 F.3d 840, 844 (8th Cir. 2005). MH Washington argues that Missouri's Prompt Pay Act does not permit recovery of costs, but Weitz was awarded costs pursuant to Fed. R. Civ. P. 54. There was no abuse of discretion in the award of costs.

### 3. Pre-judgment Interest

The district court granted Weitz pre-judgment interest. Under Missouri's Prompt Payment Act, the trial court has discretion to award the prevailing party pre-judgment interest from the date payment was due. Mo. Rev. Stat. § 431.180. Pre-judgment interest is available only if the trial court finds the amount "indisputably due" under the contract, and in a "fixed and determined or readily determinable" amount. *Mel-Lo Enterprises, Inc. v. Belle Starr Saloon, Inc.*, 716 S.W.2d 828, 829-30 (Mo. App. 1986).

-27-

MH Washington's argument against the award of pre-judgment interest rehashes its contention that there were no scheduled payments due under the contract because of the presence of the mechanic's liens on the project property. The district court did not abuse its discretion, as there was ample evidence that more than $700,000 was due long before Weitz was terminated. Further, Article 13.6.1 of the contract expressly calls for payments to bear interest at the legal rate from the date payment was due.

IV.

Defendant Summit Steel Fabricators appeals the district court's rulings: 1) denying judgment as a matter of law (or a new trial) on the issue of whether Weitz's partial pay applications, certifications, and lien waivers precluded Weitz from seeking breach-of-contract damages or rendered the evidence of Summit's breach insufficient as a matter of law; 2) refusing Summit a mitigation-of-damages jury instruction and then denying Summit a new trial for the failure to give it; and 3) granting Weitz attorney's fees and costs.

A.

This court reviews de novo a denial of a motion for judgment as a matter of law. *Chalfant*, 475 F.3d at 988. Judgment as a matter of law is granted only if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). This court grants the nonmoving party all reasonable inferences and views the facts in the light most favorable to the nonmoving party. *Chalfant*, 475 F.3d at 988. Denial of a motion for a new trial is reviewed for abuse of discretion. *Id.*

The project's progress-payment system required Summit (and the other subcontractors) first to file an application for payment with Weitz certifying that work

-28-

was done. In turn, Weitz applied for partial payments to MH Washington, which included certifications stating that "to the best of the Contractor's knowledge, information, and belief," the work was completed in accordance with the subcontract. Additionally, Weitz executed lien waivers as part of the progress payments, releasing in favor of MH Washington any liens Weitz held on the project property in connection with the money being disbursed to the subcontractor.

Summit Steel argues that the trial court erred in denying its motion for judgment as a matter of law because Weitz and the project architect certified under oath that Summit had completed at least 91 percent of its work in accordance with the contract by August 2005 (and 95 percent by November 2005), and it was paid $212,534 of an original subcontract sum of $227,486. Summit argues that under Missouri law, the architect's certification of payment is binding and conclusive on the parties in the absence of fraud, bad faith, or a misconstruction of the contract. *See, e.g.*, ***Hart & Son Hauling, Inc. v. MacHaffie***, 706 S.W.2d 586, 588 (Mo. App. 1986) (finding that an architect's final accounting that authorized payment for the work created a right to payment); ***Massman Constr. Co. v. Lake Lotawana Ass'n, Inc.***, 210 S.W.2d 398, 402 (Mo. App. 1948) (noting that a stipulation in a contract that payment shall be made upon the certificate of the engineer is equivalent to providing that the decisions of the engineer are conclusive, where the parties have either expressly agreed to do so or the circumstances are such that it is necessary to imply such a provision). *But see* ***Public Water Supply Dist. No. 8 of Jefferson Cnty. v. Maryland Cas. Co.***, 478 S.W.2d 293, 295-99 (Mo. 1972) (holding that a contractor who agreed that its project would meet certain tests was still contractually liable for providing a water distribution system that complied with the tests, even though an engineer—with authority to determine when the work had been performed in accordance with the contract—waived and postponed the tests).

Weitz argues that the partial pay applications are conditioned on current belief, and merely tools used to release progress payments. According to Weitz, they are not

intended to be, nor operate as, a release from responsibility for problems and defects. In addition, the architect ultimately rejected Summit's work in an October 2005 inspection report, which led to Summit's termination from the contract.

Each case cited by Summit involved a contract between two parties where a third-party architect or engineer was appointed by the contracting parties to resolve disputes; holding that the third-party's decision was binding gave effect to the agreement of the parties. The contract in this case has no provision explicitly giving the architect final authority to resolve construction disputes between Weitz and the subcontractors.[4] Moreover, another provision (§ 3.1) of the subcontract states that partial payment is not acceptance of a subcontractor's work, and calls for the subcontractor to bear the costs of correcting or completing any defective work.

---

[4] In its reply brief, Summit argues for the first time that the subcontract documents grant the architect authority to decide disputes between Weitz and Summit. Section 1.8 of the subcontract incorporates the prime contract between Weitz and MH Washington as part of the "Subcontract Documents." Section 1.8 states: "The Subcontract Documents together form the contract between the parties thereto, and are as fully a part of the [subcontractor] Agreement as if attached thereto or repeated therein." Under § 4.2.11 of the prime contract, the architect "will interpret and decide matters concerning performance under and requirements of, the Contract Documents on written request of either the Owner or Contractor." However, Summit's argument fails to account for other, more significant considerations: 1) Summit is not a party to the prime contract; 2) there was no "written request of either the Owner or Contractor" seeking resolution of the Weitz-Summit dispute; 3) other provisions, such as § 4.2.3 of the prime contract, expressly disavow any control by the architect over the acts or omissions of the subcontractors; or 4) the fact that this argument is made for the first time in a reply brief. *See Jenkins v. Winter*, 540 F.3d 742, 751 (8th Cir. 2008) (noting that this court does not consider issues raised for the first time on appeal in a reply brief unless the appellant gives some reason for failing to raise and brief the issue in his opening brief).

The district court did not err in denying Summit's motion for judgment as a matter of law. The language of the partial pay applications is plainly conditioned on current knowledge. There is no indication that this boilerplate language was intended to prevent Weitz from enforcing claims against a subcontractor for shoddy work in breach of the subcontract. If the contractor's certification were final and conclusive on the parties, it would write out the qualifying language that the work is certified as fully completed only "to the best of the Contractor's knowledge, information, and belief." "Missouri courts express a preference for constructions which give effect to a contract's terms; unless it cannot be avoided, language should not be interpreted to nullify contractual provisions." ***Rabius v. Brandon***, 257 S.W.3d 641, 645-46 (Mo. App. 2008). Further, the subcontract expressly states that partial payment will not constitute acceptance of a subcontractor's work. Thus, irrespective of the pay applications, Summit is still liable for the repair and completion of its work.

Alternatively, Summit argues that the trial court erred in denying a new trial, because the jury's verdict in favor of Weitz for $326,839.00 was against the weight of the evidence. According to Summit, the partial pay applications showed that when it was terminated in November 2005, it had substantially performed most of its work.

However, the evidence at trial was that Summit's work included defective welds, deformed steel, stairways and other steel elements that did not fit the opening provided, handrails that wobbled, and a general lack of personnel, equipment, and quality workmanship. The October 2005 inspection report by the architect documented a number of defects with Summit's work, characterized as "typical in all units." Weitz eventually paid more than $325,000 to repair the defects in Summit's work. The jury's verdict is well-supported by the evidence, and the district court did not abuse its discretion in denying Summit a new trial.

B.

Summit argues that the district court erred in denying a new trial because substantial evidence at trial supported the giving of a jury instruction on Weitz's failure to mitigate its damages, and Summit was prejudiced thereby. A decision by a district court to refuse a requested jury instruction is reviewed for abuse of discretion. *St. Jude Med., Inc. v. Lifecare Int'l., Inc.*, 250 F.3d 587, 294 (8th Cir. 2001). Appellate review is limited to whether the instructions, viewed on the whole, fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case. *Id.* In a diversity case, state law applies to the substance of the instructions. *Kudabeck v. Kroger Co.*, 338 F.3d 856, 863 (8th Cir. 2003).

One who is damaged by a breach of contract must make reasonable efforts to minimize his damages. *Spencer v. Millstone Marina, Inc.*, 890 S.W.2d 673, 677 (Mo. App. 1994); *Richardson v. Collier Bldg. Corp.*, 793 S.W.2d 366, 375-76 (Mo. App. 1990) (allowing defense of mitigation of damages where a general contractor was informed that necessary soil-compaction testing had not occurred and that soil was crumbling around the foundation trenches, but instead of testing and recompaction, "unreasonably proceeded to put up its building."). Ignoring its earlier argument on the sufficiency of the evidence of a breach, Summit argues that the evidence at trial "showed that [Weitz] was plainly aware of defective performance by Summit, which began as soon as Summit's came on site." Summit essentially argues that Weitz had plenty of evidence about its deficient work, but failed to give Summit timely opportunity to cure before its termination in November 2005. It argues that the evidence showed that Weitz subsequently covered up its steel work in some areas with drywall, increasing the costs to repair Summit's deficient work. However, Summit did not call witnesses or otherwise introduce damages evidence challenging whether the amount Weitz spent to fix Summit's deficient work was reasonable. *See Hertz Corp. v. RAKS Hospitality, Inc.*, 196 S.W.3d 536, 548 (Mo. App. 2006) (noting that

"[m]itigation of damages is not a complete bar to recovery, but rather affects the measure of damages that is recoverable.").

Summit received a series of notices from Weitz starting in October 2005, and Weitz argues that any obligation to cure the deficient work did not arise until the architect's rejection of Summit's work in October 2005. The evidence at trial also showed that the vast majority of Summit's steel work was ornamental steel and steel balcony decks, stairs treads, and handrails, all open and accessible for subsequent repair.

The district court ruled during trial that as a matter of law Summit did not present any evidence to warrant a mitigation instruction. Under Missouri law, a construction defect can be waived when there is knowledge and acquiescence. *Leonards v. U-Jin Enterprises, Inc.*, 811 S.W.2d 480, 485 (Mo. App. 1991). However, there is no waiver in this case: during the time that the defects first became apparent in the summer of 2005, Summit was still the steel subcontractor and the work was unfinished. In October 2005, Weitz sent Summit multiple notices about the deficient work, each of which stated a deadline to cure. Summit never took action.

The party seeking a jury instruction has the burden to produce evidence to support it. *Kudabeck*, 338 F.3d at 864. Because Summit was not prevented from curing its defective work, most of which was open and accessible for repair and completion until Summit was terminated, the district court did not abuse its discretion in refusing a mitigation instruction and denying Summit a new trial on this issue.

C.

Summit argues that the trial court abused its discretion in awarding Weitz $198,812.45 in attorney's fees and $41,265.43 in costs. An award of attorney's fees and costs is reviewed on appeal for an abuse of discretion. *Computrol, Inc. v. Newtrend, L.P.*, 203 F.3d 1064, 1072 (8th Cir. 2000).

In a diversity action, state law governs the availability of attorney's fees where no conflicting federal statute or court rule applies. **Burlington Northern R. Co.**, 207 F.3d at 534. Under Missouri law, "a trial court may award attorney's fees to a prevailing party if a contract provides for the payment of attorney's fees and expenses incurred in the enforcement of a contract provision." **First State Bank of St. Charles**, 86 S.W.3d at 175-76. In Missouri, the reasonableness of attorneys' fees is determined by examining the time expended; the nature, character and amount of the services rendered; the nature and importance of the litigation; the degree of responsibility imposed on the attorney; the amount of money involved; the degree of professional ability, skill, and experience called for and used; and the result obtained. **Roberts**, 924 S.W.2d at 558-59.

Section 12.1 of the subcontract between Weitz and Summit provides that in the event of legal proceedings between the parties, "it is expressly agreed that the prevailing party in any such action shall be entitled to recover from the non-prevailing party all costs, including reasonable attorney's fees, of pre-suit collection attempts, suit, and post judgment or settlement collection including those incurred on appeal." Weitz was the prevailing party.

1. Attorney's Fees

Summit argues that Weitz's attorney's fees are not reasonable, because the "detailed accounting" the district court ordered Weitz to provide is insufficient. The district court concluded that Weitz amply documented its request, noting that its billing records, over two inches thick, documented counsel's work to the tenth of an hour, by lawyer and by task. In addition, Summit engaged in an extensive defense, including early motion practice, extensive discovery, a lengthy summary judgment motion, a three-week jury trial, and post-trial motions.

In the alternative, Summit argues that Weitz's attorney's fees should be drastically reduced for a variety of reasons: 1) Weitz's billing records reflect purely

clerical tasks; 2) an excessive amount of hours (100) spent responding to its motion for summary judgment; 3) Summit should not be charged for 25 hours for the deposition of Summit's expert, because Weitz used the testimony to help make its case against another third-party defendant; and 4) Weitz appears to have generically allocated to Summit one-third (or one-fourth) of the total amount of attorney's fees related to trial and trial preparation based on the fact that Summit was one of three (or four) remaining defendants, an excessive amount when Weitz's case against Summit lasted two days of a three-week trial, or 10 percent.

The district court rejected each of these arguments in its post-trial order. While clerical work is not compensable at the rate charged for attorneys, paralegal work at market rates is compensable. *See Gorman v. Easley*, No. 95-0475-CV-W-3, 1999 WL 34808611, at *5 (W.D. Mo. Oct. 28, 1999). Summit's summary judgment motion contained 114 fact paragraphs, most of which were controverted and required a response. As the district court noted, this dispositive motion raised a number of complex legal issues. Summit cites no authority for the proposition that it should not be charged for taking a deposition that helped Weitz against a third-party defendant, and in any event the issue is whether the decision to take the deposition was reasonable, and whether the amount charged was reasonable. As for the allocation of trial fees to Summit, apportioning preparation time for a witness who is testifying on multiple topics, some of which pertain to all the parties' claims and some of which pertain to only one party's claims, is not an exact science. In addition, Summit benefitted by Weitz's decision to try all its claims in one case, because defense counsel shared responsibility for cross-examining several of Weitz's witnesses.

The district court did not abuse its discretion in setting attorney's fees. Weitz paid its legal bills before trial, before it knew it was going to prevail and recover its attorney's fees. The best evidence of the market value of legal services is what an informed consumer will pay for them. *Stark v. PPM America, Inc.*, 354 F.3d 666, 675 (7th Cir. 2004).

2. Costs

Summit argues that the district court erred in awarding $41,265.43 in costs to Weitz, because the district court awarded costs beyond those recoverable under 28 U.S.C. § 1920. Summit objects to Weitz's costs for expert witness fees, costs for trial exhibitions, and costs for depositions—items not authorized under 28 U.S.C. § 1920 as allowable costs.

This argument borders on the frivolous. It ignores the express agreement of the parties with regard to costs—the basis for the district court's award of costs. *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 444 (1987) (noting that 28 U.S.C. § 1920 controls a federal court's power to hold a losing party responsible for the opponent's witness fees "*when not overridden by contract* or explicit statutory authority.") (emphasis added). Awarding costs to Weitz, the district court relied on § 12.1 of the subcontract between Weitz and Summit, which states that the prevailing party "shall be entitled to recover from the non-prevailing party *all costs*, including reasonable attorney's fees, of pre-suit collection attempts, suit, and post judgment or settlement collection including those incurred on appeal." (emphasis added). By using the language "all costs," the parties agreed that all legal expenses of the prevailing party were to be paid by the unsuccessful party if litigation was necessary to enforce the contract, overriding the strictures of § 1920. "The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention." *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973). The district court did not abuse its discretion in holding that the phrase "all costs" encompasses expert witness fees, the costs of trial exhibits, and all deposition costs.

* * * * * * *

The judgment of the district court is affirmed.

_____

-36-