# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-2417

_____

John W. Cromeans, Individually and in behalf of all others similarly situated;
Elkton Bank and Trust Company; Robert Benisch

*Plaintiffs - Appellants*

v.

Morgan Keegan & Company; Armstrong Teasdale, LLP

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: March 7, 2017
Filed: June 12, 2017

_____

Before RILEY, Chief Judge,[1] GRUENDER, Circuit Judge, and GRITZNER, District
Judge.[2]

_____

[1]The Honorable William Jay Riley stepped down as Chief Judge of the United
States Court of Appeals for the Eighth Circuit at the close of business on March 10,
2017. He has been succeeded by the Honorable Lavenski R. Smith.

[2]The Honorable James E. Gritzner, United States District Judge for the Southern
District of Iowa, sitting by designation.

GRITZNER, District Judge.

Plaintiffs John W. Cromeans, Robert Benisch, and Elkton Bank and Trust Company (collectively, "Plaintiffs"), class representatives, appeal the district court's[3] denial of their motion to enforce the settlement agreement in a securities class action, as well as the district court's denial of a subsequent motion to alter or amend. Defendants Morgan Keegan and Company ("Morgan Keegan") and Armstrong Teasdale LLP (collectively, "Defendants") move to dismiss Plaintiffs' appeal. For the reasons stated below, we affirm the district court and deny Defendants' motion to dismiss.

## I.    BACKGROUND

This appeal arises out of litigation involving Defendants' alleged violations of the Missouri Securities Act relating to a failed bond issue (the Bonds) by the City of Moberly, Missouri. Morgan Keegan served as underwriter of the Bonds, and the bonds were sold on the secondary market by Morgan Keegan and by other broker-dealers.

Plaintiffs, proceeding as a class action, defined the class as all persons nationwide who purchased the Bonds between the date of the first offering and the date Morgan Keegan reduced the price of the bonds. Defendants resisted class certification, arguing that other than those who originally purchased from Morgan Keegan, it would be impossible to identify bondholders who had purchased the Bonds in the secondary market from other broker-dealers or from those who purchased the bonds on the secondary market and later sold them. The district court certified the class in September 2014. By the end of the opt-out period, class members whose aggregate Bond holdings represented most of the par value of the Bonds had retained separate counsel and opted out. The remaining members of the class had purchased

---

[3]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

-2-

or held Bonds with a total par value of $8,455,000. On January 14, 2015, the case settled after the jury had been impaneled for trial but prior to opening statements.

That day, the parties announced their settlement agreement on the record before the district court. That discussion proceeded as follows, in relevant part:

MR. HATFIELD [Attorney for Defendant Morgan Keegan]: Your Honor, the only thing I would add is, just to make sure we get it all on the table, defendants do intend to propose that for some people, that if they don't make a claim or - well, let me back up.

So there are people that have - own the bonds today, easily, identifiable. Some of them are still Morgan Keegan clients. Those people are really easy to deal with and to handle.

THE COURT: Right.

MR. HATFIELD: There are some of these other people that I may have erroneously named yesterday who bought from others who are a little hard to find that we talked about yesterday.

We do anticipate proposing a process for those people in which, if they do not submit claims, Morgan Keegan could receive some of the pot back, but that would be for a defined set of the class.

THE COURT: What is predicted as to the size?

MR. SUTER [Attorney for Defendant Morgan Keegan]: Your Honor, one of the conditions that wasn't mentioned is that the bonds be tendered back and Morgan Keegan will become the owner of the bonds. So in exchange for the pro rata amount of settlement funds that are available after attorneys' fees, those folks who actually submit the claims and who give us their bonds will, in exchange, get their pro rata share of the settlement proceeds.

-3-

To the extent that we don't know who those folks are - - and it's about a third of the class, we don't know who they are, which is why we've made these arguments all along - - if those folks don't make a claim, we get that money back because we're not getting their bonds in return.

Separately - - separate and apart from that, there are nine of the known Morgan Keegan clients who have bought and sold their bonds. They have a defined amount of money that they lost, and we've calculated that, and we've shared that with the plaintiffs. Those folks would also be settling class members who would get their proportionate share out of what's left after attorneys' fees. So it would be all-inclusive of all of the folks that are Morgan Keegan clients, and it would be all-inclusive of the folks who we do not know who make claims and give us their bonds in exchange for the pro rata share of what Your Honor may approve.

THE COURT: Now, I know there's been a discussion about being able to identify that group, and I guess - -

MR. FRANCIS [Attorney for Plaintiffs]: When there's money on the table, they'll come out. . . . .

Appellants' App. 84-86. Later, when discussing the claims process for bondholders, an attorney for Defendants stated that the dollar amount of the settlement was to be "[a]ll-inclusive of the unknown folks." Appellants' App. 88.

Eight weeks later, on March 11, 2015, the parties filed a Stipulation of Settlement (the Stipulation) memorializing their agreement. The Stipulation released Defendants from all claims relating to the Bonds and included an appellate waiver binding on Plaintiffs and Defendants, which covered both appeals of the district court's judgment as well as post-judgment proceedings. The Stipulation also included a merger clause and provided that the agreement was to be governed by Missouri law.

-4-

In the Stipulation, Defendants agreed to pay up to $8,250,000 (the "Gross Settlement Amount") to settle the litigation. The ultimate payout was to depend on a subsequent tender process. The parties agreed that Defendants would pay a fixed $3,064,863 in attorneys' fees, costs, and class representative enhancements. In addition, Defendants would pay an amount up to $5,185,317 (the "Net Settlement Fund") pursuant to the two-step formula described below.

The Stipulation divided the class into six Groups based on which Bonds a class member purchased and how the Bonds were purchased. Holders of Series B Bonds had received payments not shared by holders of other Bonds, so Series B bondholders were treated differently. The Stipulation set forth the Groups as follows:

- Class Members who hold Series B Bonds with a total par value of $2,495,000 (**Group 1**).

- Class Members who hold all other bonds with a total par value of $5,960,000 (**Group 2**).

- Nine known Morgan Keegan Purchasers who sold their Moberly Bonds and incurred realized losses. The amount of realized losses by known Morgan Keegan Purchasers who sold their Moberly Bonds is believed to be $121,984 (**Group 3**).

- Any other Class Members who sold their Moberly Bonds but did not suffer any losses (**Group 4**).

- Class Members who are unknown Non-Morgan Keegan Purchasers who sold Series B Bonds for a loss at other Broker-Dealers (**Group 5**).

- Class Members who are unknown Non-Morgan Keegan Purchasers who sold Bonds other than Series B for a loss at other Broker-Dealers (**Group 6**).

Appellants' App. 36.  The Stipulation also states, "No allocation of potential net Settlement percentage recovery has been made by Plaintiffs to (i) Group 4 because Class Members in that group sustained no losses, or (ii) Group 5 or Group 6 because it is presently unknown if those Non-Morgan Keegan Purchasers suffered any losses at other Broker-Dealers." Id.

The Stipulation then set forth a two-step process for calculating the ultimate amount of the payment to be made to the class.  The Stipulation included a table (Table 1) that set forth the background facts for application of the two-step process.

| | Bonds Currently Held | Bonds Sold | Payments Received from Bond Trustee | Net Unrealized loss | Net Realized loss | Total Known losses | Percentage of Total losses |
|---|---|---|---|---|---|---|---|
| Group 1 (Series B) | 2,495,000 | - | $ 1,900,952 | $ 594,048 | - | $ 594,048 | 9.88% |
| Group 2 (Series A & C) | 5,960,000 | - | $ 663,966 | $ 5,296,034 | - | $ 5,296,034 | 88.09% |
| Bonds to be Tendered | 8,455,000 | | $ 2,564,918 | $ 5,890,082 | - | $5,890,082 | 97.97% |
| Group 3 (Series B & C) | - | 1,330,000 | Included | - | $ 121,948 | $ 121,948 | 2.03% |
| Totals | 8,455,000 | 1,330,000 | $ 2,564,918 | $ 5,890,082 | $ 121,948 | $6,012,030 | 100.00% |
| Group 4 (Series A B or C - No losses) | - | Irrelevant | Irrelevant | - | - | | - |
| Group 5 (Series B - Non-Morgan Keegan Purchasers Purchasers) | - | Unknown | Unknown | - | Unknown | Unknown | Unknown |
| Group 6 (Series A & C- Non-Morgan Keegan Purchasers Purchasers) | - | Unknown | Unknown | - | Unknown | Unknown | Unknown |
| No Bonds to be Tendered | | Unknown | Unknown | - | Unknown | Unknown | Unknown |

Table 1

Cromeans v. Morgan Keegan & Co, Inc., No. 2:12-CV-04269-NKL, slip op. at 3 (W.D. Mo. Jan. 11, 2016); Appellants' App. 37.  Table 1 represents that the par value of the "Bonds Currently Held" by Groups 1 and 2 together was $8,455,000.  Below Table 1, the Stipulation set forth the two-step calculation process:

> **Step 1:** The dollar amount of any payment from the Net Settlement Fund that any Class Member in Group 1 or in Group 2 may receive will depend upon the actual number of Bonds (at par value) that are tendered to Morgan Keegan to "buy back" in connection with this

Settlement, which will in turn affect the amount of the Gross Settlement Amount that Morgan Keegan and Armstrong Teasdale will be obligated to fund. This is so because if Bonds currently held by Class Members are not tendered to Morgan Keegan, then Morgan Keegan and Armstrong Teasdale are not obligated to fund the proportionate amount of Gross Settlement Amount represented by Bonds that are not tendered.

**Step 2:** The dollar amount of any payment from the Net Settlement Fund that any Class Member in Group 1 or in Group 2 may receive will further depend upon whether or not any Class Members in Group 5 or in Group 6 submit timely and proper Claim Forms. This is so because:

(i) if any valid claims are submitted by Group 5 Class Members, this may increase the current total known losses on Series B Bonds, and hence may reduce accordingly the amount to which individual Series B Class Members may entitled from the Net Settlement Fund allocated to Series B Members as set forth in Column 8 for Group 1 (*i.e.*, 9.88%) in the chart above; and/or

(ii) if any valid claims are submitted by Group 6 Class Members, this may increase the current total known losses on Bonds other than Series B Bonds, and hence may reduce accordingly the amount to which individual Class Members other than Series B Class Members may entitled from the Net Settlement Fund as set forth in the Column 8 for Group 2 (*i.e.*, 88.09%) in the chart above.

Appellants' App. 37-38.

On October 2, 2015, the district court granted Plaintiffs' motion for final approval of the Stipulation and dismissed Plaintiffs' claims with prejudice. Once the time for bondholders to tender their Bonds had expired, Morgan Keegan had received Bonds representing $6,970,000 of the outstanding $8,455,000 par value. This represented approximately 82.44% of the par value of the outstanding Bonds.

Defendants multiplied the Net Settlement Fund value ($5,185,317) by the percentage of par value Bonds tendered by bondholders in Groups 1 and 2 (82.44%) to reach a value of $4,274,590 owed pursuant to Step 1 of the Stipulation. To this, Defendants added $121,948 owed to Group 3. This resulted in a sum of $4,396,538 that Defendants claimed they were obligated to fund pursuant to Step 1.

Then, applying Step 2, Defendants reallocated a portion of the funds owed to Groups 1 and 2 to Groups 5 and 6 based on the volume of claims submitted by class members in the latter Groups. Class members in Groups 5 and 6 submitted claims corresponding to Bonds with a total par value of $880,000. Defendants then offset these claims against the claims of bondholders in Groups 1 and 2 and did not recalculate the total amount owed to the class. Adding the value of $4,396,538 to the fixed $3,064,683 allocated for fees, costs, and class representatives, Defendants calculated their total liability under the Stipulation to be $7,461,221.

After Defendants paid the $7,461,221, Plaintiffs filed a Motion to Enforce Stipulation of Settlement ("Motion to Enforce"). Plaintiffs argued that the claims made by class members in Groups 5 and 6 reduced the number of "Bonds currently held" under Step 1 because the Bonds sold by class members in Groups 5 and 6 were not held by class members in Groups 1 and 2 at the time of the Stipulation. Plaintiffs claimed that Defendants' refusal to exclude the par value of the Bonds subject to claims by Groups 5 and 6 resulted in a shortfall of $380,954. The district court denied the Motion to Enforce and held that Defendants' payment calculations complied with the Stipulation. The district court held that the Stipulation did not increase Defendants' payment obligations based on claims made by Groups 5 or 6 but merely allocated the funds owed among class members.

Plaintiffs then moved to alter or amend the district court's order, which the district court also denied. Plaintiffs argued that the district court improperly placed the burden of proof upon them, but the district court found that its prior order

construed the Stipulation as a matter of law and thus did not take into account burdens of proof. The district court also rejected Plaintiffs' argument that its construction of the Stipulation was unreasonable simply because under certain circumstances application of the calculation process could have resulted in the class receiving nothing, noting that most of the outstanding Bonds actually were tendered. Plaintiffs appeal these rulings.

On May 20, 2016, after Plaintiffs filed their Notice of Appeal, Plaintiffs moved for an order requiring the settlement administrator to distribute to the class the proceeds from the settlement that had been paid by Defendants. The amount to be distributed did not include the disputed $380,954 that is the subject of this appeal. On July 18, 2016, the district court ordered the settlement administrator to distribute the funds to the class. Per the Stipulation, the back of each check was to contain a release of claims against the Defendants "for all claims alleged or which could have been alleged in District Court for the Western District of Missouri case, 2:12-cv-04269-NKL . . . including all claims relating to the Moberly Bonds." Appellants' App. 28. After Plaintiffs filed their opening brief in this appeal, Defendants filed a Motion to Dismiss the Appeal ("Motion to Dismiss") based on this distribution, arguing that the instant case is now moot.

## II.    DISCUSSION
### A.    Motion to Dismiss

Defendants contend that the distribution of settlement checks to the class moots Plaintiffs' appeal and finally resolves this case. Defendants argue that the releases and waivers contained in the Stipulation and in the settlement checks prevent Plaintiffs from pursuing any further appeals, and that receipt of settlement extinguishes Plaintiffs' claims. Defendants thus argue that Plaintiffs lack Article III standing and that application of the prudential mootness doctrine would also be appropriate.

The fundamental requirement that federal jurisdiction requires "cases or controversies" means that federal courts cannot entertain claims that are moot. Life Inv'rs Co. of Am. v. Fed. City Region, Inc., 687 F.3d 1117, 1121 (8th Cir. 2012). "'When, during the course of litigation, the issues presented in a case lose their life because of the passage of time or change in circumstances . . . and a federal court can no longer grant effective relief, the case is considered moot' and cannot be heard by a court." Id. (alteration in original) (quoting Ali v. Cangemi, 419 F.3d 722, 723 (8th Cir. 2005) (en banc)). "If an issue is moot in the Article III sense, we have no discretion and must dismiss the action for lack of jurisdiction." Ali, 419 F.3d at 724.

This appeal continues to present a live controversy, notwithstanding the various waivers and releases in the Stipulation and settlement checks and even the distribution of funds to the class. Plaintiffs are not pursuing their original claims relating to the Bonds. Rather, the dispute before this court concerns whether Defendants fully discharged their obligations under the Stipulation. The Stipulation explicitly granted that the district court would have continuing jurisdiction for the purposes of "enforcing this Agreement" and "addressing settlement administration matters." Appellants' App. 33. Settlement agreements are contracts that confer standalone rights and duties upon each party. See Vidacak v. Okla. Farmers Union Mut. Ins., 274 S.W.3d 487, 490 (Mo. Ct. App. 2008) ("Release agreements, like that signed by Respondent and his wife in this case, are contracts."); Anderson v. Bd. of Curators of the Univ. of Mo., 103 S.W.3d 394, 399 (Mo. Ct. App. 2003) ("Principles applicable to contractual agreements govern our interpretation of the professors' releases or settlement agreements, and our primary goal is to enforce the parties' intended agreement." (internal citations omitted)).[4] Like the releases in the Stipulation, the releases printed on the settlement checks distributed to the class relate to the underlying securities claims, not disputes over whether Defendants complied with the terms of the Stipulation.

---

[4] There is no dispute that Missouri law governs the interpretation of the Stipulation based on its choice of law provision. See Downing v. Riceland Foods, Inc., 810 F.3d 580, 587 (8th Cir. 2016).

This court also declines to dismiss Plaintiffs' appeal as prudentially moot. Prudential mootness is a discretionary doctrine that allows courts to dismiss a case where the court is unable to provide an effective remedy. See Ali, 419 F.3d at 724. This appeal concerns whether Defendants owe the class an additional $380,954 over and above the funds already distributed. The district court has the ability to provide that remedy. Defendants imply that interpreting the Stipulation in accordance with Plaintiffs' position on appeal could result in a liability calculation according to which Defendants would be entitled to claw back funds from the class, but Defendants have identified no evidence that would lead to such a scenario, nor have Defendants appealed the district court's order compelling the settlement administrator to pay the class members.

## B.    Construction of the Stipulation

On appeal, Plaintiffs argue that the district court erred in construing the Stipulation by failing to interpret the phrase "Bonds currently held" according to its ordinary meaning. Plaintiffs also argue that the district court failed to consider the Stipulation as a whole and misapplied the burden of proof, and that the resulting construction was patently unreasonable.

This court reviews a district court's construction of a settlement agreement *de novo*. United States v. Bailey, 775 F.3d 980, 981 (8th Cir. 2014); Transcon. Ins. Co. v. Rainwater Const. Co., 509 F.3d 454, 456 (8th Cir. 2007). "Interpretation of a release or a settlement agreement is governed by the same principles applicable to any other contractual agreement, and the primary rule of construction is that the intention of the parties shall govern." Andes v. Albano, 853 S.W.2d 936, 941 (Mo. 1993). Missouri courts determine the intent of the parties "based on the contract language alone unless its terms are ambiguous." Health Care Found. of Greater Kan. City, 507 S.W.3d 646, 661 (Mo. Ct. App. 2017); see also Andes, 853 S.W.2d at 941 ("[L]anguage that is plain and unambiguous on its face will be given full effect within the context of the agreement as a whole unless the release is based on fraud, accident, misrepresentation, mistake, or unfair dealings."). "Under Missouri law, determining

the meaning of an unambiguous provision is a question of law for the court, determined by giving language its plain and ordinary meaning without resort to extrinsic evidence." Shaw Hofstra & Assocs. v. Ladco Dev., Inc., 673 F.3d 819, 825 (8th Cir. 2012) (quoting Weitz Co. v. MH Washington, 631 F.3d 510, 524 (8th Cir. 2011)). "A contract is ambiguous when the terms are susceptible of more than one reasonable meaning." Id. (quoting Weitz, 631 F.3d at 524).

Plaintiffs argue that the district court misconstrued the term "Bonds currently held." The provision of the Stipulation setting forth "Step 1" states, "[I]f Bonds currently held by Class Members are not tendered . . . then [Defendants] are not obligated to fund the proportionate amount of Gross Settlement Amount represented by Bonds that are not tendered." Appellants' App. 37. This provision requires the calculation of a percentage of the Net Settlement Fund to be paid by Defendants based on the par value of the Bonds that were eventually tendered. The parties agree that the par value of the Bonds actually tendered was $6,970,000. The parties disagree, however, about how the Stipulation defines the appropriate point of comparison, though both agree that the Stipulation compels a comparison between the Bonds tendered and the "Bonds currently held." Defendants defined the "Bonds currently held" as a constant value of $8,455,000 in par value based on, among other references, Table 1. Plaintiffs argue that the Bonds tendered should only be compared against the par value of Bonds actually held by members of the class (those in Groups 1 and 2) at the time the Stipulation was executed. Because class members in Groups 5 and 6 made claims for losses relating to Bonds totaling $880,000 of par value, the amount of "Bonds currently held" should be reduced accordingly by $880,000. Plaintiffs argue this view best represents the ordinary meaning of the phrase "Bonds currently held." Claims from class members in Groups 5 and 6, who had sold their Bonds, reflect the fact that some number of Bonds were not held by class members at the time of settlement.

The Stipulation, however, unambiguously defines the par value of "Bonds currently held" as a fixed amount: $8,455,000. Table 1 represents that $8,455,000 is

the par value of "Bonds Currently Held," and as the district court noted, there is no indication in the Table that this number is subject to change. The Stipulation contains other references to the class members "hold[ing]," in the present tense, Bonds totaling $8,455,000 in par value. E.g., Appellants' App. 36 (Group 1 holds Bonds with par value of $2,495,000, and Group 2 holds Bonds with par value of $5,960,000). By contrast, the use of the phrase "Bonds currently held" in the description of Step 1, which Plaintiffs highlight, contains no similar definitional referent. Rather, as the district court noted, the description of Step 1 states that Defendants have no obligation to pay the class with respect to Bonds that are not tendered.

Plaintiffs argue that a view of the Stipulation as a whole shows that the $8,455,000 figure simply represents the par value of the Bonds originally purchased by class members, not those currently held. According to Plaintiffs, the definitions of Groups 5 and 6 – class members who had sold their Bonds for a loss – shows that it was understood that the value of "Bonds currently held" would be less than $8,455,000. Plaintiffs also point to the definition of Step 2, which provides that the amounts that Groups 1 and 2 will receive is conditional on claims submitted by Groups 5 and 6; this, in Plaintiffs' view, also reflects an understanding that class members in Groups 1 and 2 did not currently hold Bonds with a combined par value of $8,455,000 at the time the Stipulation was signed. Nevertheless, as stated above, the Stipulation explicitly represents that $8,455,000 was the value of "Bonds currently held." The district court correctly observed that the definition and inclusion of Groups 5 and 6, and the effect that claims from those Groups have on the Step 2 calculation, each relate not to the total amount owed by Defendants but to the relative amounts owed toward each Group.

Ultimately, the language of the Stipulation clearly states that the value of "Bonds currently held" was a fixed amount, or $8,455,000. Plaintiffs' argument that the Stipulation did not mean to do this relies on assumptions that the parties did not mean to say what the Stipulation says, but instead meant to state that the value of "Bonds currently held" depended on the outcome of the claims process. Under

Missouri law, an "[a]mbiguity arises only where the terms are reasonably open to more than one meaning, or the meaning of the language used is uncertain." Health Care Found., 507 S.W.3d at 661 (quoting Woods of Somerset, LLC v. Developers Sur. & Indem. Co., 422 S.W.3d 330, 335 (Mo. Ct. App. 2013)). "Ambiguity does not arise merely because the parties disagree over the meaning of a provision, and courts may not create ambiguity by distorting contractual language that may otherwise be reasonably interpreted." Id. (quoting Woods of Somerset, 422 S.W.3d at 335). Where, as here, the contract is subject to only one reasonable interpretation, "the parties' intent may be gathered from the terms of the contract alone, and no extrinsic evidence may be introduced to contradict the terms of the contract or to create an ambiguity." State ex rel. Greitens v. Am. Tobacco Co., 509 S.W.3d 726, 741 (Mo. 2017). The district court did not err in interpreting the Stipulation according to its unambiguous meaning and in holding that Defendants complied with the Stipulation's payment obligations.

Plaintiffs also argue that the district court erred in not considering statements made on the record before the district court regarding the parties' settlement prior to the drafting of the Stipulation. Plaintiffs argue that the statements before the district court are not parol evidence because the transcript of the colloquy before the district court was incorporated into the Stipulation.

Under Missouri law, "[t]o incorporate terms from another document, the contract must 'make [] clear reference to the document and describe[] it in such terms that its identity may be ascertained beyond a doubt.'" State ex rel. Hewitt v. Kerr, 461 S.W.3d 798, 810-11 (Mo. 2015) (second and third alterations in original) (quoting Intertel, Inc. v. Sedgwick Claims Mgmt. Servs., Inc., 204 S.W.3d 183, 196 (Mo. App. 2006)). "The intent to incorporate must be clear." Id. at 810. However, the existence of a merger clause strongly indicates that a writing is a complete and final agreement. Johnson ex rel. Johnson v. JF Enters., LLC, 400 S.W.3d 763, 766 (Mo. 2013).

The Stipulation states that the parties previously put the settlement on the record in chambers. This reference to the discussion in chambers, included in the section of the Stipulation that recites the history of the litigation, does not convey any clear intent to incorporate the representations made before the district court as contractual terms. The Stipulation also contains a merger clause. Thus, to the extent the transcript constitutes a document that the Stipulation could incorporate, the district court did not err in refusing to look outside the four corners of the Stipulation. Moreover, it is clear from the transcript that even when discussing settlement before the district court, prior to drafting the Stipulation, Defendants had only agreed to pay class members based on Bonds actually tendered, and no statement by either party spells out Plaintiffs' preferred calculation method.[5]

## C.     Unreasonable Results

Plaintiffs also argue that the district court's interpretation of the Stipulation leads to unreasonable results. Under Missouri law, "courts 'reject an interpretation that involves unreasonable results when a probable or reasonable construction can be adopted.'" Stonebrook Estates, LLC v. Greene Cty., 275 S.W.3d 353, 355 (Mo. Ct. App. 2008) (quoting Blackburn v. Habitat Dev. Co., 57 S.W.3d 378, 386 (Mo. Ct. App. 2001)). Plaintiffs argue that the district court's interpretation was unreasonable because it made Plaintiffs' recovery dependent to some extent on the actions of individuals who had no legal relationship with Defendants: individuals who purchased Bonds from class members *after* the class period and thus would have had the ability to tender or not tender those Bonds. Had all class members sold their Bonds after the class period, and had no subsequent purchasers tendered their Bonds, the class

---

[5] Plaintiffs also argue that Defendants should be estopped from interpreting the Stipulation as they have done based on statements made before the district court. Plaintiffs, however, did not present an estoppel argument to the district court, either in the Motion to Enforce or the subsequent Motion to Alter or Amend. Arguments not raised before the district court are waived on appeal. See St. Paul Fire & Marine Ins. Co. v. Compaq Comput. Corp., 539 F.3d 809, 824 (8th Cir. 2008).

members would have received nothing under the district court's interpretation of the Stipulation. Plaintiffs' hypothetical scenario is far removed from the facts of this case. Plaintiffs stated in the Stipulation that they expected to receive compensation for 86% of their losses. Instead, Plaintiffs received compensation for 80% of their losses. The district court did not err in refusing to abrogate the parties' bargain because the Plaintiffs recovered slightly less than expected following a conditional tender process that the parties knew to be contingent, based only on the theoretical possibility of a wildly different outcome.

### D. Burdens of Proof

Finally, Plaintiffs argue that the district court erred by placing the burden of proof on them. Plaintiffs argue that because Defendants seek to assert a special meaning of otherwise unambiguous language, Defendants should have had the burden of proof before the district court. The district court stated in its order denying Plaintiffs' Motion to Enforce that "[a] party requesting specific performance of settlement agreement has the burden of proving the claim 'by clear, convincing, and satisfactory evidence.'" Appellees' App. 1256 (quoting Precision Inv., LLC v. Cornerstone Propane, LP, 220 S.W.3d 301, 303 (Mo. 2007)). The district court also held the meaning of the Stipulation to be unambiguous as a matter of law.

The district court did not err. A party seeking specific performance bears the burden of proof on disputed issues of fact. See Precision Inv., 220 S.W.3d at 303. Here, the court construed the Stipulation as a matter of law. In doing so, the district court did not place a burden of proof on any party. As discussed above, the Stipulation is unambiguous; thus, Defendants by definition cannot be seeking to assert a special meaning of any language in the Stipulation. See McFarland v. O'Gorman, 814 S.W.2d 692, 694 (Mo. Ct. App. 1991) ("If a written contract is unambiguous, one of the parties should not be permitted to avoid his obligations under it on the grounds that the obligations under the contract are not those that were intended, unless the evidence is clear and convincing.").

## III.  CONCLUSION

We conclude that the district court correctly held that Defendants' payment to the class complied with the unambiguous language of the Stipulation.  The judgment of the district court is affirmed.

_____